# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SNOW PHIPPS GROUP, LLC, and DECOPAC HOLDINGS INC., | ) ) ) | |
| Plaintiffs-Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2020-0282-KSJM |
| KCAKE ACQUISITION, INC., KOHLBERG INVESTORS VIII-B, L.P., KOHLBERG INVESTORS VIII-C, L.P., KOHLBERG TE INVESTORS VIII, L.P., KOHLBERG TE INVESTORS VIII-B, L.P., KOHLBERG INVESTORS VIII, L.P., and KOHLBERG PARTNERS VIII, L.P., | ) ) ) ) ) ) ) ) ) | |
| Defendants-Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM OPINION

Dated Submitted: March 22, 2021
Date Decided: April 30, 2021

Michael A. Barlow, Eliezer Y. Feinstein, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Andrew J. Rossman, Silpa Maruri, Sascha N. Rand, Owen F. Roberts, Jonathan J. Feder, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Plaintiffs-Counterclaim Defendants Snow Phipps Group, LLC and DecoPac Holdings Inc.*

William M. Lafferty, Thomas W. Briggs, Jr., Daniel T. Menken, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Andrew G. Gordon, Eric Alan Stone, Alexia D. Korberg, Adam J. Bernstein, Nina M. Kovalenko, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Defendants-Counterclaim Plaintiffs KCAKE Acquisition, Inc., Kohlberg Investors VIII-B, L.P., Kohlberg Investors VIII-C, L.P., Kohlberg TE Investors VIII, L.P., Kohlberg TE Investors VIII-B, L.P., Kohlberg Investors VIII, L.P., and Kohlberg Partners VIII, L.P.*

**McCORMICK, V.C.**

Julia Child is rumored to have once said: "A party without a cake is just a meeting." The decorated cake stands as the defining feature of celebratory gatherings and, with the exception of the adept in-home baker, the cultural trend is to outsource preparation of these celebratory centerpieces to in-store supermarket bakeries.

DecoPac Holdings Inc. ("DecoPac") sells cake decorations and technology to supermarkets for use in their in-store bakeries. On March 6, 2020, at the outset of the COVID-19 pandemic, the defendant-buyers agreed to acquire DecoPac from the plaintiff-seller. The buyers entered into a debt commitment letter and committed to use their reasonable best efforts to work toward a definitive credit agreement on the terms set forth in the debt commitment letter. They also agreed to seek alternative financing if the committed funds became unavailable.

The buyers lost their appetite for the deal shortly after signing it, as government entities issued stay-at-home orders around the country and DecoPac's weekly sales declined precipitously. Although DecoPac's highly experienced management team predicted that sales would recover rapidly, the buyers were less confident. Fearing that people would no longer desire decorated cakes to celebrate life events while forced to quarantine and social distance, the buyers began to question the business wisdom of the transaction.

Rather than use reasonable best efforts to work toward a definitive credit agreement, the buyers called their litigation counsel and began evaluating ways to get out of the deal. Without input from DecoPac management, they prepared a draconian reforecast of DecoPac's projected sales based on uninformed (and largely unexplained) assumptions that

were inconsistent with real-time sales data. They sent this reforecast to their lenders with demands for more favorable debt financing terms. When the lenders refused the buyers' demands, the buyers informed the seller that debt funding was no longer available. The buyers then conducted a perfunctory and unsuccessful four-day search for alternative debt financing at the seller's insistence.

On April 8, 2020, the buyers told the seller that they would not close because debt financing remained unavailable. They also stated that they did not believe that DecoPac would meet the bring-down or covenant-compliance conditions in the purchase agreement because DecoPac was reasonably likely to experience a material adverse effect (an "MAE") and failed to operate in the ordinary course of business. This litigation ensued.

Meanwhile, as DecoPac's management predicted, DecoPac's sales began to recover. Perhaps there is a greater need to celebrate the milestones of life amidst the tragedy of a pandemic. Or perhaps humans simply have an insatiable desire for decorated cakes. Whatever the reason, DecoPac's precipitous decline in performance proved a momentarily blip. By the end of 2020, DecoPac's actual total sales were down only 14% from 2019. Even under the buyer's draconian reforecast, quarterly EBITDA was projected to return to 2019 levels by Q3 2021.

At trial, the plaintiffs proved that DecoPac did not breach the MAE representation, given the durational insignificance and corresponding immateriality of the decline in sales. They also proved that, even if it was reasonable to expect that these sales declines would give rise to an MAE, the seller-friendly exception for events "related to" government orders applied, and DecoPac had not suffered disproportionately to comparable companies. The

2

plaintiffs likewise demonstrated that DecoPac operated in the ordinary course of business in all material respects. The plaintiffs further proved that the buyers breached their obligation to use reasonable best efforts in connection with the debt financing.

Adding another layer of complication to the analysis, the buyers claim that, despite these holdings, it need not close. They rely on a contractual exception to the parties' agreement conditioning the seller's right to specific performance on fully funded debt financing. Because there is no debt financing in place, the buyers argue that the court may not grant specific performance. The court disagrees. Applying the prevention doctrine, this decision deems the debt financing condition met because the buyers contributed materially to lack of debt financing by breaching their reasonable-best-efforts obligation.

Chalking up a victory for deal certainty, this post-trial decision resolves all issues in favor of the seller and orders the buyers to close on the purchase agreement.

## I. FACTUAL BACKGROUND

Trial took place over five days. The record comprises 2,059 trial exhibits, live testimony from eight fact and seven expert witnesses, video testimony from six fact witnesses, deposition testimony from twenty fact and seven expert witnesses, and thirty stipulations of fact.[1] These are the facts as the court finds them after trial.

---

[1] The Factual Background cites to: C.A. No. 2020-0282-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); trial demonstratives (by "PDX" and "DDX" number); the trial transcript (Dkts. 272–74, 283–84) ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order (Dkt. 252) ("PTO"). The parties called John Anderson, Yvette Austin Smith, Gregory Bedrosian, Ryan Brauns (Ares Capital Management LLC 30(b)(6) witness), Steven J. Davis, John Alexander Forrey, Jonathan F. Foster, Sam Frieder, John F. Gardner, William Hanage, Seth H. Hollander,

## A.     DecoPac

DecoPac is a Delaware corporation and the corporate parent of non-party DecoPac, Inc., a Minnesota-based supplier and marketer of cake decorating products.[2]  For ease of reference, this decision refers to DecoPac Holdings Inc. and DecoPac, Inc. together as "DecoPac" or the "Company."

DecoPac supplies cake-decorating ingredients and products to in-store bakeries in supermarkets, such as Walmart, Sam's Club, and The Kroger Company.[3]  Its products are used to create decorated cakes for celebrations like birthday parties and graduations.[4] DecoPac offers a variety of edible and non-edible products, including sprinkles, fondant, pastry bags, and various inedible figurines.[5]  DecoPac also provides proprietary tech-enabled platforms like PhotoCake, which allows bakeries to print edible, customizable images onto baked goods, and Cakes.com, which allows consumers to personalize and order baked goods from bakeries.[6]

---

Carol Loundon (Churchill Asset Management LLC 30(b)(6) witness), Anup Malani, Alan H. Mantel, Julie Martinelli, Christopher McKinney, Marcus Meyer (Madison Capital Funding 30(b)(6) witness), Tobin Opheim, Phillip P. Smith (Antares Capital LP 30(b)(6) witness), Richard Alec Somers, Lukas Spiss (Owl Rock Capital Private Fund Advisors 30(b)(6) witness), Steven Twedell, Garry Vaynberg, Maxwell Wein, Joseph G. Welsh, Cameron Wood, and Gordon Woodward by deposition.  The transcripts of their respective depositions are cited using the witnesses' last names and "Dep. Tr." or, for 30(b)(6) witnesses, the name of the firm and "Dep. Tr."

[2] PTO ¶¶ 3–4.

[3] JX-42 at 9–12; JX-239 at 4–8.

[4] JX-42 at 9–12; JX-239 at 4–8.

[5] JX-239 at 8.

[6] *Id.* at 9.

## B. Snow Phipps Determines to Sell DecoPac.

Plaintiff Snow Phipps Group, LLC ("Snow Phipps," and with DecoPac Holdings Inc., "Plaintiffs") is a private equity firm focused on investments in middle-market companies.[7] Snow Phipps acquired DecoPac in 2017.[8] Snow Phipps partner Alan Mantel became the partner in charge of the DecoPac investment in the summer of 2019.[9] After assessing the investment, he came to the conclusion that Snow Phipps could either "exit the investment and have an acceptable rate of return" or "embark on a multiyear strategy to increase the growth rate . . . to further expand the business."[10] Snow Phipps decided to exit.[11]

In December 2019, Snow Phipps engaged Piper Sandler Companies ("Piper Sandler") to run a sale process for DecoPac.[12] Piper Sandler managing director Gary Vaynberg led the team.[13]

## C. Kohlberg Offers to Acquire DecoPac.

In January 2020, Piper Sandler approached non-party Kohlberg & Company, LLC, a private equity firm focused on investing in middle-market companies.[14] Piper Sandler

---

[7] PTO ¶ 2.

[8] *Id.* ¶ 8.

[9] Trial Tr. at 16:23–17:9 (Mantel).

[10] *Id.* at 17:24–18:4 (Mantel).

[11] *See id.* 17:10–13 (Mantel).

[12] PTO ¶ 9.

[13] Trial Tr. at 832:18–833:18 (Vaynberg).

[14] PTO ¶ 5. This decision refers to Kohlberg & Company, LLC, together with all of its affiliates named as defendants, as "Kohlberg."

5

initially contacted Kohlberg partner Seth Hollander.[15] Word then spread to Kohlberg vice president Alexander Forrey, who worked at Snow Phipps on the DecoPac deal team until he joined Kohlberg in August 2019.[16] Hollander was initially "lukewarm" on the deal, but Forrey "pitched him reasonably hard on it."[17] Forrey believed that there were "a lot of value-creation opportunities" and that "it would be a really good investment for Kohlberg."[18]

Hollander eventually decided to move forward and led the Kohlberg deal team.[19] Forrey helped coordinate the deal and led negotiations with lenders.[20] A third Kohlberg team member, associate Chris McKinney, handled analytical and administrative tasks.[21]

On January 31, 2020, Hollander, Forrey, and McKinney circulated an initial investment memorandum to the firm's investment committee.[22] The deal team believed that Kohlberg could preempt the sale process—meaning that it could conduct due diligence and acquire the company before a broader sale process occurred.[23] Overall, the

---

[15] JX-218; Trial Tr. 432:14–19 (Hollander).

[16] JX-245.

[17] Trial Tr. at 1287:24, 1288:24–1289:1 (Forrey).

[18] *Id.* at 1289:6–8 (Forrey).

[19] *Id.* at 432:22–433:15 (Hollander).

[20] *Id.* at 433:22–434:3 (Hollander); *id.* at 1289:9–15 (Forrey).

[21] *Id.* at 433:18–21 (Hollander); *id.* at 1214:16–24 (McKinney).

[22] *See* JX-287; JX-290; Trial Tr. at 434:8–435:7 (Hollander). Kohlberg's investment committee is a subset of senior professionals at the firm that approves the firm's investment decisions. *See* Trial Tr. at 442:14–18, 472:4–8 (Hollander).

[23] *See* JX-290 at 5; Trial Tr. at 435:11–24 (Hollander).

memorandum pitched DecoPac as "an attractive investment opportunity" for a number of reasons, including its "[u]nique and defensible value-added distribution business model" and its "[c]ompelling financial profile with high degree of recession resiliency."[24] The memorandum also identified six investment risks; even though COVID-19 was emerging as an issue, the memorandum did not refer to COVID-19.[25] On February 3, the investment committee granted the deal team approval to proceed with a potential bid.[26]

On February 3, Kohlberg sent Snow Phipps a letter of intent to acquire DecoPac for $580 million.[27] The letter highlighted Kohlberg's familiarity with DecoPac, ability to provide certainty of closing, and commitment to work "with DecoPac's key incumbent lenders" to "arrange debt financing commitments by the time of execution of definitive documentation for this Transaction, such that the closing of the Transaction would not be subject to a financing contingency."[28] Snow Phipps rejected Kohlberg's initial bid.[29]

After its initial due diligence, Kohlberg remained "highly interested in acquiring the company,"[30] and on February 18, 2020, it increased its bid to $600 million.[31] The second

---

[24] JX-290 at 5; Trial Tr. at 436:1–440:4 (Hollander).

[25] *See* JX-290 at 11–12; Trial Tr. at 440:7–24 (Hollander).

[26] *See* JX-270 at 14; Trial Tr. at 472:4–8 (Hollander).

[27] PTO ¶ 10; JX-314.

[28] JX-314 at 4.

[29] *See* Trial Tr. at 22:18–20 (Mantel).

[30] JX-420 at 5 ("In particular, we've been impressed with the continued growth of the Company through its pricing strategy and high degree of account retention."). By February 18, Kohlberg had "completed the vast majority of [its] commercial and market diligence." *Id.*

[31] *Id.*; PTO ¶ 11.

letter of intent stated that Kohlberg had "completed substantially all of its business diligence," including a site visit to one of DecoPac's facilities, and was prepared to begin its confirmatory third party diligence "immediately."[32] The letter cautioned that Kohlberg had not yet received access to the Quality of Earnings ("QofE") report from DecoPac's accounting advisor, PricewaterhouseCooper.[33] The purchase price was thus subject to confirming "2019 Pro Forma Adjusted EBITDA of $49.8 million."[34]

Snow Phipps accepted the $600 million bid and agreed to move forward with additional diligence.[35] Other potential counterparties had expressed interest in acquiring DecoPac,[36] and one had submitted an indication of interest,[37] but Snow Phipps placed great weight on Kohlberg's representation that it was "uniquely positioned to complete the Transaction with speed and certainty."[38] Snow Phipps determined to move forward because a deal with Kohlberg would be "fastest," provide "the most certainty," and yield "the highest price."[39]

---

[32] *See* JX-420 at 6; Trial Tr. at 843:11–844:4 (Vaynberg).

[33] JX-420 at 6.

[34] *Id*.

[35] *See* Trial Tr. at 27:2–5 (Mantel).

[36] *See* PTO ¶¶ 13–14.

[37] *See id.* ¶ 14.

[38] Trial Tr. at 25:12–26:8 (Mantel); *see* JX-420 at 5.

[39] *See* Trial Tr. at 26:18–27:4 (Mantel).

### D. Events Leading to the Agreements

After agreeing to a price, the parties proceeded to complete diligence and to negotiate a formal purchase and sale agreement. Within a few days, Kohlberg's counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), and Snow Phipps's counsel, Dorsey & Whitney LLP ("Dorsey & Whitney"), began to communicate on these subjects.[40] The process culminated in a March 6, 2020 signing.

In terms of deal negotiations, the notable events between February 18 and March 6 include the following:

- On February 21, Forrey and McKinney held two financial diligence calls with Vaynberg and DecoPac management.[41]

- On February 27, Hollander, Forrey, McKinney, Managing Partner Sam Frieder, and Chief Investment Officer Gordon Woodward conducted a second site visit to one of DecoPac's facilities.[42]

- On March 2, Maine Pointe, Kohlberg's global supply-chain consultant, spoke with DecoPac CEO John Anderson, CFO Steven Twedell, and Vaynberg on March 2.[43]

- On March 4, Kohlberg demand a price reduction, to which Plaintiffs agreed.[44]

- Also on March 4, Plaintiffs requested that "pandemics" and "epidemics" be added to the MAE definition in the purchase agreement, but Kohlberg rejected that language.[45]

---

[40] PTO ¶ 12.

[41] *See* JX-457.

[42] Trial Tr. at 645:10–22 (Hollander); *see* JX-500; Trial Tr. at 332:5–24 (Twedell).

[43] *See* JX-604; Trial Tr. at 905:7–20 (Vaynberg); *id.* at 192:10–193:11 (Anderson).

[44] *See* PTO ¶ 15; JX-703 at 4; Trial Tr. at 34:22–35:2 (Mantel).

[45] JX-669 at 1, 29, 109.

- On March 5, at an all-partners meeting, Kohlberg's deal team outlined the DecoPac transaction, its risks, and how to mitigate them, and the partners approved the transaction.[46]

- On March 6, the parties signed a purchase agreement and related documents.[47]

In the background, the COVID-19 pandemic was escalating. On the day that Kohlberg submitted its $600 million bid, COVID-related headlines dominated the front page of the *New York Times*. One story discussed Apple's warning "that demand for its devices in China had been hurt by the outbreak."[48] By February 25, the Center for Disease Control had warned "that the new coronavirus will almost certainly spread in the United States," and that "cities and towns should plan for 'social distancing measures.'"[49] On March 4, California declared a state of emergency.[50] By March 5, global school-closings affected 300 million students, with several closures in the U.S. and warnings of more to come.[51]

One of the questions posed by this case is whether Kohlberg contractually agreed to assume various COVID-19-related risks. To contextualize its legal argument on this point, Kohlberg claims that it did not identify demand-related COVID-19 risks during due diligence, expressly contracted for Plaintiffs to assume demand-related risks when

---

[46] *See* JX-696; JX-706; Trial Tr. at 474:2–15 (Hollander).

[47] *See* PTO ¶¶ 16–19.

[48] *See* JX-1911.

[49] JX-1912.

[50] JX-1475.

[51] *See* JX-688.

negotiating the MAE provision, and did not demand a lower purchase price due to factors related to COVID-19. Plaintiffs deny these factual contentions, claiming that Kohlberg considered demand-related COVID-19 risks in due diligence, failed to shift those risks to Plaintiffs during negotiations, and reduced the purchase price in view of those risks.

These factual disputes prove largely irrelevant to the outcome of this decision, which turns on unambiguous contractual language. Because the parties focus significant attention on these factual disputes, however, this decision resolves them.

### 1. Kohlberg Explores COVID-19 Risks in Due Diligence.

Plaintiffs contend that Kohlberg conducted due diligence on and agreed to assume three risks related to COVID-19: (i) risk to DecoPac's supply chain in China, where COVID-19 was then prevalent; (ii) risk to equity, debt, and M&A market volatility; and (iii) risk to demand for DecoPac's products.

Of these three risks, Kohlberg admits it conducted diligence on and agreed to assume risks concerning the supply chain[52] and market volatility.[53] Kohlberg denies assuming any demand-related risks. One Kohlberg witness went so far as to suggest that

---

[52] *See* JX-709; JX-2414 at 17–18; Trial Tr. 1302:5–1303:1 (Forrey). Kohlberg concluded that the supply-chain risk was tolerable. Trial Tr. at 452:4–454:21, 469:7–24 (Hollander).

[53] *Id.* at 456:24–457:5 (Hollander). Kohlberg worried that extended volatility would mean eventually selling DecoPac "in a less-favorable environment than when we bought the business," *id.* at 456:17–18 (Hollander), and debt markets also became less favorable to borrowers in early March. *Id.* at 99:3–11 (Mantel); *id.* at 908:8–13 (Vaynberg). Kohlberg, however, was "ready to sign a contract very quickly" and recognized "the value that . . . speed brought to" Plaintiffs. *Id.* at 467:10–20 (Hollander). Kohlberg "ultimately decided, with the deal that [it] signed, that [market volatility] was a risk [it] [was] willing to absorb." *Id.* at 456:24–457:5 (Hollander).

11

Kohlberg never considered the impact that quarantines, stay-at-home orders, or other short-term restrictions might have on the demand for DecoPac's products,[54] but that was an overstatement and contradicted by the witness's later testimony.[55]

Although it is true that Kohlberg was focused primarily on supply-chain issues related to COVID-19,[56] Kohlberg also investigated demand risks during due diligence.

In fact, in response to global developments, Kohlberg proactively evaluated how the spread of the virus in the U.S. might impact its portfolio companies. On February 26, 2020, Woodward, Kohlberg's self-proclaimed "chief worry officer," warned Hollander, Frieder, and others that "coronavirus [was] spreading across Europe and, despite our fearless leader's rhetoric, per the CDC [was] likely going to get meaningfully worse in the US," and that the firm should therefore evaluate the impact of "restrictions on public gatherings."[57] Those senior partners and the deal team visited DecoPac's facilities the next

---

[54] *See, e.g.*, *id*. at 459:16–21 (Hollander).

[55] *Compare*, *id*. at 459:16–21 (Hollander) ("We thought the risk of impact to the company's demand was unfathomable. We just didn't think it was going to happen."), *with id*. at 451:21–452:3 (Hollander) ("We had evaluated . . . a potential impact to the company's demand from COVID impacting behavior."), *and id*. at 647:10–24 (Hollander) (confirming that, during the February 27 site visit, Kohlberg representatives asked Anderson "what he thought would happen to demand as a result of COVID").

[56] *See, e.g.*, *supra* note 43 and accompanying text; JX-604 at 3–4; JX-694 at 21–22; JX-709; JX-2414 at 17–18; *see also* Trial Tr. at 452:14–20 (Hollander) ("Much of DecoPac's products are manufactured in China and shipped to DecoPac here in North America. So the concern was, because COVID-19 was really prevalent in China at the time, that there could be some disruption by the Chinese manufacturers in the manufacture and shipping of the products to DecoPac.").

[57] Trial Tr. at 1404:19–1407:1 (Woodward); *see* JX-612 at 2.

day.[58]  During that visit, Kohlberg raised the possibility of "demand being materially impacted because there's no parties."[59]

During the all-partners meeting on March 5, Kohlberg's deal team expressly identified risks posed by COVID-19.[60]  The presentation identified "key investment risks"[61] and called out the "[p]otential demand issues if comprehensive quarantines were instituted in [the] core U.S. market."[62]

It is clear, therefore, that Kohlberg was concerned with the demand-related risk arising from COVID-19.  It is equally clear that Kohlberg dramatically underestimated in early March 2020 the broad range of consequences that COVID-19 would have.

As reflected in the March 5 presentation, Kohlberg viewed COVID-19 risk as subject to a variety of mitigating factors, noting that "comprehensive U.S. quarantines seem unlikely" and that any "impact would likely be temporary."[63]  Hollander testified that "at the time, it was unthinkable that exactly what we were doing, sitting around a conference table, eating cupcakes and talking, would be problematic, something you couldn't do."[64] He further testified that, pre-signing, they were "living [their] lives as [they] always had."[65]

---

[58] *See supra* note 42 and accompanying text.

[59] Trial Tr. at 458:8–459:2, 461:18–462:3, 645:10–647:21 (Hollander).

[60] *See* JX-694 at 18; Trial Tr. at 465:16–22, 469:7–470:23 (Hollander).

[61] JX-694 at 18.

[62] *Id.*

[63] *Id.*

[64] Trial Tr. at 458:22–459:2 (Hollander).

[65] *Id.* at 457:13–458:7 (Hollander).

Indeed, the team signed the deal documentation in Miami, fresh off a firmwide event featuring "the full investment team packed in a room heatedly debating trivia."[66]

### 2. Negotiation of the MAE Provision

On March 4, Plaintiffs sought to carve out "pandemics" and "epidemics" from the definition of a "Material Adverse Effect" two days before signing.[67] At the time, the draft purchase agreement contained an MAE provision that made no reference to pandemics or epidemics but included other broad carveouts for effects related to "general economic conditions," "terrorism or similar calamities," and "government orders."[68] Snow Phipps's counsel sought to expressly add the terms "epidemics" and "pandemics."[69] Kohlberg responded on March 5, reverting to the pre-existing draft.[70]

That evening, Plaintiffs' counsel again asked that pandemics and epidemics be excluded from the MAE definition.[71] Kohlberg's counsel rejected the change, stating that Kohlberg "could not accept the epidemic/pandemic risk."[72] Also that evening, Vaynberg called Hollander "about the MAE point" to further pursue a pandemic carveout, and Hollander responded that "we absolutely cannot give it."[73]

---

[66] *Id.* at 1316:21–1317:15 (Forrey).

[67] *See* JX-669 at 1, 29, 109.

[68] *See* JX-661 at 15–16.

[69] JX-669 at 29, 109.

[70] JX-711 at 1, 21.

[71] JX-741; JX-749.

[72] Trial Tr. at 944:22–945:2 (Martinelli).

[73] JX-751 at 1; *see* Trial Tr. at 484:1–18 (Hollander).

14

Again, Kohlberg takes a strident position, arguing that the *only* conclusion to be drawn from this exchange is that the parties allocated to Plaintiffs any potential unknown risks of the pandemic, including the risk that demand for DecoPac's products would be decimated as Americans radically shifted the way they celebrate occasions in response to the pandemic.[74]

This conclusion, however, does not square with multiple aspects of the record. Vaynberg testified that when he spoke to Hollander about this issue on May 5, Hollander's explanation for rejecting further changes to that definition was simply not "want[ing] to be the first private equity firm that plays in the middle market space to have that language in the MAE."[75]  Woodward denied that Kohlberg intended "some special risk transfer that was atypical to the seller as a result of the insertion of [the MAE] clause."[76]  Mantel testified that he would have never agreed to the transaction if he believed that by sticking with the pre-existing MAE definition, Kohlberg was shifting COVID-19 demand risk to Plaintiffs.[77]

---

[74] *See* Trial Tr. at 464:1–7 (Hollander).

[75] *Id.* at 882:17–883:16 (Vaynberg); *see also id.* at 43:5–11 (Mantel) ("[Vaynberg] conveyed to me that [Hollander] said that, as a matter of precedent, Kohlberg was unwilling to include this language, that they didn't want to be the first middle-market private equity firm to include this language.").

[76] *Id.* at 1437:7–1438:1 (Woodward) (testifying that the understood that the MAE provision was a "typical clause").

[77] *Id.* at 45:8–12 (Mantel) (testifying that Snow Phipps would "absolutely not" "have agreed to this deal and signed the SPA at the reduced price of $550 million if [it] understood that Snow Phipps was bearing the risk of COVID").

The most illuminating evidence on this point was the testimony of the deal attorneys who negotiated the provision. Both Kohlberg's and Plaintiffs' deal attorneys testified that the proposed epidemic/pandemic language was a form of "belt and suspenders."[78] During her deposition, Kohlberg's deal attorney described the March 5 conversation with Plaintiffs' deal attorney as follows:

> [I] tried to give him some comfort, which was that the language within the MAE definition, because there was a general carve-out for economic downturns, I thought that that provided a good amount of coverage on the area -- on the issue because, frankly, at the time, that's what -- how I viewed the risk of COVID to our country.[79]

Both attorneys testified that, even without express epidemic/pandemic language, if COVID-19 caused any of the events that were carved out from the MAE definition, the events would not qualify as an MAE.[80] For example, "if the impact of COVID has an economic downturn, it impacted [DecoPac's] business not disproportionately relative to others in the industry, then I viewed that as being our [Kohlberg's] risk."[81] The same was true for the carveout for governmental orders.[82]

---

[78] *See id.* at 946:4–9 (Martinelli); Wood Dep. Tr. 202:10–25.

[79] Trial Tr. at 945:7–13 (Martinelli).

[80] *See id.* at 944:14–946:18 (Martinelli) ("I told [Wood] that we could not accept the epidemic/pandemic risk. . . . Putting aside the disproportionate impact language, if the impact of COVID has an economic downturn, it impacted [DecoPac's] business not disproportionately relative to others in the industry, then I viewed that as being [Kohlberg's] risk."); Wood Dep. Tr. at 202:13–18 (testifying that the words "epidemic/pandemic" "would cover any . . . situation that is not already covered by the exceptions to the definition which were already very broad").

[81] Trial Tr. at 946:14–18 (Martinelli).

[82] *Id.* at 947:8–948:3 (Martinelli).

### 3. Purchase Price Reduction

On March 4, McKinney delivered Kohlberg's demand for a price cut from $600 million to $550 million by email.[83] Snow Phipps was in a bind. They did not think it was realistic to reach out to other bidders given the effect of COVID-19 on markets and their desire to avoid a failed sales process, so they accepted the lowered offer.[84]

McKinney's March 5 email attached a two-page PowerPoint presentation discussing the basis for the revised valuation.[85] The proposal identified three reasons. The first was "[h]istoric market volatility."[86] The second was the "[r]eduction in underwritable EBITDA" to $46.7 million, which was below the $49.2 million in "validated 2019 Pro Forma EBITDA" that Kohlberg had used in its internal investment committee materials the day before.[87] The third was "2020 budget expectations reduced," which again highlighted the impact of coronavirus by predicting "some pull back in consumer demand in the short to medium term" and the implications of the "near term given economic uncertainty."[88]

Kohlberg denies that the third concern in any way related to COVID-19.[89] Kohlberg insists that the "vast majority" of the price reduction came from the reduction in EBITDA

---

[83] *See* PTO ¶ 15; JX-703 at 1, 4.

[84] Trial Tr. at 35:9–23 (Mantel).

[85] JX-703 at 4–5.

[86] *Id.* at 4.

[87] *Compare id.* at 5, *with* JX-694 at 5.

[88] JX-703 at 4.

[89] *See* Trial Tr. at 1314:14–21 (Forrey).

due to QofE.[90]  According to Kohlberg, the $600 million bid assumed DecoPac's 2019 pro forma adjusted EBITDA was $49.8 million, but Kohlberg came to realize that number was off.[91]  Snow Phipps's QofE EBITDA figures were inconsistent, fluctuating between approximately $46 and $49 million.[92]  After submitting its February 18 bid, Kohlberg worked with its own accounting advisor, KPMG, to "dig[] in" and evaluate the data, and concluded that process with a "different view of the timing and the complexity of achieving those savings."[93]  Kohlberg and KPMG ultimately arrived at a pro forma EBITDA of $49.2 million.[94]

Kohlberg also claims to have had unanswered concerns about DecoPac's 2020 budget.  Although Kohlberg initially requested a monthly budget with customer-by-customer projections, on February 28 Kohlberg received only a quarterly budget and annual customer breakdowns.[95]  On March 2, Kohlberg conveyed to Vaynberg its concerns with both the format and content of these budget documents.[96]  Forrey explained that

---

[90] *Id*. at 478:2–4 (Hollander).

[91] *Id*. at 474:22–475:13 (Hollander).

[92] *See* JX-345 at cells O71, O73 (February 8 first draft of QofE, showing $46.699 million pro forma adjusted and $48.430 million run-rate adjusted EBITDA); JX-362 at cells G36, G40 (February 11 draft showing $48.547 million adjusted and $49.773 million pro forma adjusted EBITDA); JX-403 at cell F16 (February 16 DecoPac model showing $49.614 million adjusted EBITDA); JX-470 at tab 3, cells O51, O62 (February 19 final QofE showing $46.540 million pro forma adjusted and $48.388 million run-rate adjusted EBITDA).

[93] Trial Tr. at 1304:12–1305:5 (Forrey).

[94] JX-650 at 6.

[95] Trial Tr. at 1308:18–1309:15 (Forrey); *see* JX-557.

[96] JX-2460 at 1–2.

quarterly and annual data did not let Kohlberg "see the progression though the year."[97] He flagged a "confusing" progression in the budget, where Q1 was predicted to be "basically flat" over 2019 while the rest of the year grew significantly: "[I]f you're not growing in Q1, why is that? Is there not consumer demand for it, or is there something else going on?"[98] Forrey also highlighted that the budget for Sam's Club "didn't really jibe with what they had been telling us."[99]

Forrey's testimony regarding Kohlberg's concerns over DecoPac's QofE and 2020 budget was credible and squares with the contemporaneous evidence. Yet, these concerns were not Kohlberg's actual reason for the $50 million price cut, as simple math confirms. Kohlberg identified a $600,000 difference in pro forma EBITDA as a result of business and QofE diligence work.[100] Applying Kohlberg's quoted "all-in multiple of 12.4x" to that figure amounts to approximately $7.4 million.[101] This comports with Vaynberg's belief, as of March 1, that Kohlberg would ask for a $10 million price reduction after QofE

---

[97] Trial Tr. at 1310:9–13 (Forrey).

[98] *Id.* at 1311:7–14 (Forrey).

[99] *Id.* at 1310:14–1311:6 (Forrey).

[100] *See* JX-650 at 6 (validating $49.2 million in pro forma EBITDA, which is $600,000 less than the $49.8 million pro forma EBITDA on which the $600 million bid was predicated).

[101] *See id.*

diligence was completed.[102]  So Kohlberg's insistence that "DecoPac's QofE and 2020 budget drove the price cut" does not add up.[103]

Rather, Kohlberg demanded a 10% price reduction on the eve of signing because market volatility caused by COVID-19, coupled with Kohlberg's ability to offer speed and deal certainty against near-term risks, gave Kohlberg the leverage to do so.

This is clear from internal Kohlberg communications.  In an email to Frieder and Woodward, Forrey supported the price reduction by explaining "that the key value in our bid today is our speed and certainty to signing" and predicting that the new proposal "shows our seriousness to transact in an uncertain environment."[104]  Hollander instructed that the revised proposal include "one slide about corona virus and market conditions . . . [and the] impact on our debt financing cost."[105]

The two-page presentation Kohlberg emailed to Snow Phipps when demanding the cut also supports this finding.  The first sentence of the presentation stated that Kohlberg was "prepared to sign the attached Stock Purchase Agreement at a valuation of $550 million in cash, and have committed debt financing and Reps and Warranty ("R&W")

---

[102] *See* JX-599 at 1.

[103] *See* Dkt. 285, Defs.-Countercl. Pls.' Opening Post-Trial Br. ("Defs.' Post-Trial Opening Br.") at 18.  Even giving Kohlberg the benefit of the doubt and crediting the $46.7 million pro forma EBITDA number that was included in the presentation accompanying the revised bid, this amounts to a $3.1 million decrease relative to the figure accompanying the February 18 bid.  Applying the 12.4x all-in multiplier to that figure, that would represent $38.4 million in value.  Thus, Kohlberg cannot show that QofE and the 2020 budget were the exclusive drivers of the $50 million price cut.

[104] JX-744 at 1.

[105] JX-719 at 1.

insurance."[106] The last sentence of the first page reiterated that Kohlberg was "prepared to execute definitive documentation immediately" and further stated that it "believe[d] that given our unique knowledge of the business we are . . . taking significant risk other parties would be unwilling to assume."[107] As Forrey testified, Kohlberg drafted this presentation "in order to put maximum pressure on Snow Phipps to sign a deal quickly."[108]

Plaintiffs' witnesses' testimony is consistent with this finding. Mantel understood that Kohlberg had reduced the purchase price "because of COVID."[109] Vaynberg testified that, in the phone calls between Hollander and Vaynberg about the revised bid, the "first" and "primary" justification Hollander offered to explain the price cut was "coronavirus and the disruption that that will cause to the company's business model."[110]

### E. The Agreements

The parties executed the transaction documents on March 6, 2020.[111] Kohlberg acquisition vehicle KCAKE Acquisition, Inc. ("KCAKE"), Snow Phipps, and DecoPac Holdings Inc. executed the Stock Purchase Agreement (the "SPA").[112] Kohlberg acquisition vehicle KCAKE Merger Sub Inc. and the Lenders (defined below) executed a

---

[106] JX-703 at 4.

[107] *Id.*

[108] Trial Tr. at 1350:21–1351:1 (Forrey).

[109] *Id.* at 29:9–15 (Mantel).

[110] *Id.* at 867:1–868:2 (Vaynberg).

[111] PTO ¶¶ 16–19.

[112] JX-1 ("SPA").

Debt Commitment Letter (the "DCL").[113] A group of Kohlberg entities (the "Kohlberg Funds"), DecoPac Holdings, Inc., and KCAKE executed an Equity Commitment Letter (the "ECL").[114] The Kohlberg Funds and DecoPac Holdings, Inc. executed a "Limited Guarantee."[115]

The parties' dispute centers on the SPA and DCL. This decision summarizes the pertinent provisions for background purposes here and then discusses them in greater detail in the Legal Analysis.

### 1. The SPA

The SPA allocated risks in a range of provisions, including the following:

- Plaintiffs represented in Section 3 that there had not been a change that had, or "would reasonably be expected to have," a "Material Adverse Effect" (the "MAE Representation")[116] and that none of DecoPac's top-ten customers had "stopped or materially decreased the rate of business done" with DecoPac (the "Top-Customers Representation").[117]

- Plaintiffs agreed in Section 6.1(a) to cause the Company to "operate the Business in the Ordinary Course of Business" (the "Ordinary Course Covenant").[118]

- Kohlberg represented in Section 5.6 that it had delivered a fully executed DCL, that the DCL was binding and not subject to any conditions other than

---

[113] JX-2 ("DCL").

[114] JX-3 ("ECL"). The "Kohlberg Funds" are Defendants Kohlberg Investors VIII-B, L.P., Kohlberg Investors VIII-C, L.P., Kohlberg TE Investors VIII, L.P., Kohlberg TE Investors VIII-B, L.P., Kohlberg Investors VIII, L.P., and Kohlberg Partners VIII, L.P. *See* PTO ¶ 19; ECL ¶ 1. Teachers Insurance and Annuity Association of America was also a party to the ECL that agreed to fund a portion of the equity commitment. ECL ¶ 1.

[115] JX-4 ("Limited Guaranty").

[116] SPA § 3.9(a).

[117] *Id.* § 3.21(a).

[118] *Id.* § 6.1(a)(i).

those reflected on the face of the document, and that "Debt Financing shall not be a condition to closing."[119]

- Kohlberg agreed in Section 6.15 to extensive covenants in connection with "Debt Financing," including to "use its reasonable best efforts" to undertake certain actions relating to Debt Financing,[120] not to modify the DCL in a way that would jeopardize the availability of funding absent consent from Plaintiffs,[121] and to use "reasonable best efforts" to seek alternative financing in the event the DCL should "expire" or otherwise become "unavailable."[122]

- Kohlberg could refuse to close under Section 7.1(a) unless Plaintiffs' representations and warranties were true and correct as of the closing date (the "Bring Down Condition").[123] The Bring-Down Condition was subject to a materiality qualifier, providing that inaccuracies did not excuse closing unless they "would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."[124]

---

[119] *Id.* § 5.6 (representing that Kohlberg had "delivered to the Company a fully executed . . . debt commitment letter . . . reflecting the Debt Financing Sources' commitment, subject to the terms and conditions therein, to provide Buyer at Closing with debt financing"). Kohlberg further represented that the DCL was "not subject to any conditions precedent other than as set forth therein and, as of the date hereof, [was] in full force and effect and [was] the legal, valid, binding and enforceable obligations of Buyer and, to the knowledge of Buyer, each of the other parties thereto." *Id.*

[120] *Id.* § 6.15(a).

[121] *Id.* § 6.15(b) (barring Kohlberg from unilaterally consenting to any change to the DCL that would, among other restrictions, "materially adversely impact the ability of the Buyer to . . . consummate the transactions contemplated by this Agreement or make funding of the commitments thereunder less likely to occur").

[122] *Id.* § 6.15(d) (providing that "[i]f notwithstanding the use of reasonable best efforts by Buyer to satisfy their respective obligations under this Section 6.15, the Debt Financing or the Debt Commitment Letter (or any definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, Buyer shall . . . use its reasonable best efforts promptly to arrange for alternative financing from reputable financing sources (which, when added with the Equity Financing, shall be sufficient to pay the amounts required to be paid under this Agreement from other sources)").

[123] *Id.* § 7.1(a).

[124] *Id.*

- Kohlberg could refuse to close under Section 7.1(b) if Plaintiffs failed to perform and comply with all of their respective covenants (the "Covenant Compliance Condition").[125] The Covenant Compliance Condition was subject to a materiality qualifier, requiring that Plaintiffs perform "in all material respects."[126]

- Kohlberg had the right to terminate under Section 8.1(d) if Plaintiffs breached the conditions in Section 7.1.[127] This right was qualified by a mandatory cure provision requiring Kohlberg to provide "a notice in writing . . . specifying the breach and requesting that it be remedied" within twenty days (the "Cure Provision").[128]

- Kohlberg agreed in Section 11.14 that Plaintiffs are entitled to specific performance "if and only if" certain conditions are met, including that "the full proceeds of the Debt Financing have been funded to Buyer" (the "Debt Financing Condition").[129]

- Plaintiffs agreed in Section 8.3(a) that a termination fee of $33 million (the "Termination Fee") "shall be the *sole and exclusive remedy* (whether at law, in equity, in contract, in tort or otherwise) . . . against Buyer . . . *for any and all losses*, costs, damages, claims, fines, penalties, expenses (including reasonable fees and expenses of outside attorneys), amounts paid in settlement, court costs, and other expenses of litigation suffered as a result of any breach of any covenant or agreement in this Agreement or the failure of the transactions contemplated hereby to be consummated."[130] Plaintiffs also agreed, in Section 8.3(a), that "[u]nder no circumstances" will Plaintiffs "be entitled . . . to receive both a grant of specific performance and the . . . Termination Fee," or "to receive monetary damages other than the Termination Fee."[131]

---

[125] *Id.* § 7.1(b).

[126] *Id.*

[127] *Id.* § 8.1(d).

[128] *Id.*

[129] *Id.* § 11.14(b).

[130] *Id.* (emphasis added).

[131] *Id.*

On its face, the SPA does not have an expiration date and imposes an ongoing obligation to close. Section 8.1(c) provides a May 5, 2020 "Outside Termination Date," after which either party may terminate the agreement, provided that "the right to terminate . . . shall not be available to any party hereto whose failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Termination Date."[132]

### 2. The Debt Commitment Letter

Kohlberg entered into the DCL with Antares Capital LP ("Antares"), the First Lien Administrative Agent; Ares Capital Management LLC ("Ares"), the Second Lien Administrative Agent; Owl Rock Capital Private Fund Advisors LLC ("Owl Rock"); and Churchill Asset Management LLC ("Churchill," and collectively with Antares, Ares, and Owl Rock, the "Lenders").[133] Antares, Owl Rock, and Ares were existing lenders to DecoPac, which is why Kohlberg viewed them as good counterparties for the DCL.[134]

The DCL established a framework that the parties would use to draft a final credit agreement. It was heavily negotiated.[135] In the DCL, the parties agreed that "this

---

[132] *Id.* § 8.1(c). Kohlberg does not argue that termination is appropriate under Section 8.1(c).

[133] *See* DCL at 1–2; Trial Tr. 488:4–11 (Hollander).

[134] *See* Trial Tr. at 22:10–16, 1607:11–17 (Mantel); *id.* at 490:10–21 (Hollander); *id.* at 800:2–3 (Antares); Owl Rock Dep. Tr. at 129:20–130:9; Ares Dep. Tr. at 16:6–18:4.

[135] *See* SPA § 6.15(a); Trial Tr. at 1294:14–1295:5 (Forrey).

Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein."[136]

The DCL stated that the Lenders would provide a total of $365 million in debt financing facilities that would be used to fund the DecoPac acquisition.[137]

The DCL contained a financial maintenance covenant that permitted a maximum leverage ratio (the "Financial Covenant").[138]  That covenant would be tested quarterly, beginning on the last day of the second full fiscal quarter after the closing date of the acquisition.[139]  Generally, when a borrower defaults on a financial covenant, the entire loan becomes payable, and creditors may seek appropriate remedies under law, including foreclosing on collateral if the loan is secured.[140]

---

[136] DCL ¶ 9.

[137] *Id.* at 1.

[138] *Id.* Ex. B, at B-38.  The DCL defines "Consolidated Total Net Leverage Ratio" as "the ratio of (i) consolidated net debt (consisting of indebtedness for borrowed money, capitalized lease obligations and purchase money debt as reflected on the balance sheet of the Borrower and its restricted subsidiaries, *minus* unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries to (ii) Consolidated EBITDA for the most recent four fiscal quarter period[s]."  *Id.* Ex. B, at B-12–13.

[139] *Id.* Ex. B, at B-38.

[140] *See, e.g.*, JX-125 Art. VIII (EN Engineering final credit agreement); *see also* Trial Tr. at 492:17–24 (Hollander) ("[W]hen you breach the covenant, you are -- you're in breach of the contract, and, you know, ultimately, if they so chose, the lenders could accelerate the loan if it wasn't able to be repaid, and if their leverage was greater than 10.25 times, it probably could be, they could take possession of the collateral, which would be obviously disastrous for the . . . holders.").

A critical aspect of the Financial Covenant was the definition of "Consolidated EBITDA." The parties heavily negotiated this point,[141] and the result was a detailed, three-page definition of "Consolidated EBITDA."[142]

Forrey and Kohlberg's Director of Credit, Albert Scheer, negotiated the DCL for Kohlberg.[143] They selected as a precedent document the agreement from Kohlberg's acquisition of EN Engineering, which they regarded as borrower-friendly precedent.[144] In addition, Ares, Antares, and Churchill were parties to the EN Engineering agreement, so Kohlberg believed that they would agree to similar terms.[145]

The DCL, under its terms, was set to expire on May 12, 2020.[146]

### F. Events Leading to Litigation

As discussed below, immediately after signing, Kohlberg braced for a possible decline in DecoPac sales, preparing a "shock case" to determine how far DecoPac's revenue could decline before Kohlberg would breach the Financial Covenant post-closing. And shortly after signing, DecoPac's sales began to decline precipitously. Even so, both Kohlberg's deal team and DecoPac's management remained confident that the Company would recover by year-end. Kohlberg partners, however, developed buyer's remorse and

---

[141] *See, e.g.*, Trial Tr. at 783:9–18 (Antares); *id.* at 827:18–24 (Owl Rock).

[142] *See* DCL Ex. B, at B-38–40.

[143] *See* Trial Tr. at 1289:18–1290:19 (Forrey).

[144] *See id.* at 1290:20–1291:23 (Forrey).

[145] *See* JX-125 at 1.

[146] *See* DCL ¶ 15; SPA § 8.1(c).

set on a course of conduct predestined to derail Debt Financing and supply a basis for terminating the agreements.

### 1. Kohlberg's "Shock Case"

On the same day that Kohlberg executed the transaction documents, Kohlberg created a COVID-19-inspired "shock case" measuring how its investment in DecoPac would perform in the event of a revenue decline.[147]

The shock case projected that DecoPac could experience a steep decline in revenue and remain compliant with its post-closing debt covenants reflected in the DCL. The model showed that DecoPac could withstand between a 15% and 20% revenue decline before violating the Financial Covenant.[148] Forrey also told Hollander that, if the shock case were to consider the addbacks contained in the DCL's "incredible EBITDA definition," then the Company could suffer up to a 25% decline in revenue and stay in compliance with the Financial Covenant.[149]

### 2. DecoPac Veers Toward the Shock Case.

On March 17, Anderson mentioned during a call with Forrey that DecoPac had experienced a 50% decrease in call volume the previous day and "expect[ed] bakery to slow down."[150] Anderson also conveyed that one of DecoPac's top customers, the H.E.

---

[147] *See* JX-805.

[148] *Id.* at cells N80–81, O80–81, P80–81.

[149] *See id.* at 1.

[150] JX-879 at 2.

Butt Company ("HEB"), had put all orders on hold "for at least a week."[151] Anderson did not expect a persistent decline. He "expect[ed] it to catch-up" after two to three weeks.[152] The following week, DecoPac began providing Kohlberg with weekly sales reports.[153]

Kohlberg's deal team had already reached similar conclusions. By March 16, they came to believe that the shock case was likely but that the impact would be short lived.[154]

In the weeks that followed, DecoPac's weekly sales reports reflected that the Company continued to struggle. During the week of March 21, weekly "regular" sales were down 42.4% year-over-year.[155] During each of the following four weeks, regular sales were down 63.9%, 60.3%, 62.2% and 53.4%, respectively.[156] Total sales during those five weeks saw a year-over-year decrease of 27.5%, 54.8%, 55.5%, 41.9%, and 15.4%, respectively.[157]

---

[151] *Id.*

[152] *Id.*

[153] *See* JX-1059; JX-1210; JX-1365.

[154] *See* JX-843 at 1 (Hollander stating his view on March 13, that any impact to the Company would be short-lived and that the Company will see "a swift bounce back"); JX-857 at 1 (McKinney stating in a March 16, internal email to Forrey that, in his view, DecoPac was experiencing the "worst case scenario that we talked about at [the investment committee meeting]," i.e., the shock case, and that "any pain would be limited to a quarter or so"); *id.* (Forrey responding to McKinney and stating that DecoPac would not "see 100% drop out of sales, but it is definitely going to have an impact for a few weeks").

[155] JX-2432 at cell Q15; DDX-3.25. DecoPac's "regular" sales are sales that exclude preorders or "exclusions," which are typically placed up to five months in advance. *See* Trial Tr. at 238:17–21, 239:10–16, 240:4–8 (Anderson).

[156] JX-2432 at cells Q16–19; DDX-3.25.

[157] JX-2432 at cells S15–19.

On March 23, Anderson decided that DecoPac needed to minimize marketing expenditures, capital expenditures, and labor costs[158] and halt spending "on all outside consultants."[159] He also instructed DecoPac's vendors to halt or delay production and shipments[160] and "pulled the plug on all IDDBA spending."[161] DecoPac made Kohlberg aware of these changes to DecoPac's business.[162]

Sales to some of DecoPac's top-ten customers were also declining. By the end of April 2020, year-to-date sales to each of DecoPac's top-ten customers were down between 8.1% and 30.8% compared to January–April 2019.[163] Sales to HEB realized the largest decline, with year-to-date sales decreasing 30.8%.[164] In terms of gross profit, year-to-date changes ranged from a 27.9% decrease to a 0.7% increase.[165] Again, HEB recorded the

---

[158] JX-1331 at 2.

[159] JX-982; Trial Tr. at 276:1–11 (Anderson).

[160] JX-1022 at 1–2; Trial Tr. at 276:24–277:5 (Anderson); *see also* JX-1022 (Twedell stating: "I did have a conversation with [Anderson] and understand that we will not be contacting our customers and asking them things that may cause them to re-think their planned orders.").

[161] JX-982. *But see* Trial Tr. at 276:12–18 (Anderson) (clarifying that this referred only to "the [IDDBA] show that was going to be in June," and "[n]ot all spending"). "IDDBA" refers to the International Dairy-Deli-Bakery Association.

[162] *See* JX-1063; JX-1153.

[163] JX-1232 at 36.

[164] *Id.*

[165] *Id.*

largest decline, with year-to-date profit decreasing 27.9%.[166] DecoPac's total year-to-date decrease in sales was 16.5%, and its total year-to-date decrease in profits was 14.8%.[167]

Consistent with the prognosis of Anderson and Kohlberg's deal team, however, the sales decline proved a blip. As discussed below, the Company began to recover by the week of April 18. Ultimately, DecoPac's 2020 revenue declined 14% and adjusted EBITDA declined 25% relative to 2019.[168]

### 3. Kohlberg Develops a Case of Buyer's Remorse.

Before the decline in DecoPac's performance, Kohlberg's senior leadership began to develop buyer's remorse.

Kohlberg's sense of regret seems to have first emerged around March 17, when Kohlberg convened an all-partners meeting to discuss the impact of COVID-19.[169] In preparing for the meeting, the Kohlberg partners discussed whether Kohlberg would have sufficient funds to support the capital needs of its portfolio companies and whether Kohlberg would have to recycle capital in order to fund the acquisition of DecoPac.[170] Around the same time, senior leadership was considering opportunities to invest in distressed debt, which seemed like a potentially more attractive use of capital from the Kohlberg Funds.[171]

---

[166] *Id.*

[167] *Id.* at 36–37.

[168] PDX-15; *see* JX-182; JX-1717; JX-1933.

[169] *See* JX-859.

[170] *See id.*; JX-872.

[171] Trial Tr. at 986:12–987:5 (Frieder); *see id.* at 1421:17–1422:9 (Woodward).

On the heels of the March 17 all-partner meeting and after consulting with Woodward and Frieder, Hollander scheduled a call with Paul Weiss to discuss "closing" on DecoPac.[172] At that point, Kohlberg had zero quantitative data regarding DecoPac's performance beyond learning about two days of reduced call volume, and Kohlberg had done nothing to investigate the situation further.

The call occurred on March 18.[173] During the call, McKinney circulated to counsel by email a redline of the SPA reflecting edits to the MAE provision, with the cover email stating "[a]s discussed, please see attached."[174] The March 18 call was the first of what would become near-daily calls among Paul Weiss litigators, Kohlberg's deal team, Woodward, and Frieder.[175]

### 4. Kohlberg Begins Preparing Pessimistic Forecasts.

Immediately after the March 18 call, Hollander reported to Woodward and Frieder on his discussion with Paul Weiss.[176] Although the participants claim not to recall what they discussed,[177] the conversation kicked off a chain of modeling exercises, all of which projected that the Company's performance would decline precipitously.

---

[172] *See* JX-884. Both litigators and transactional attorneys were scheduled to be on the call. *See id.*

[173] JX-883 at 1.

[174] *Id.* at 3.

[175] *See, e.g., id.*; JX-1910; Trial Tr. at 698:16–699:6 (Hollander); *see also* PDX-6.

[176] JX-891.

[177] *See* Trial Tr. at 608:8–10 (Hollander); *id.* at 1443:7–12 (Woodward); Frieder Dep. Tr. at 45:13–46:12.

On March 19, Hollander set up a call with Forrey and McKinney "to discuss some Deco analysis that I think we should get started."[178] Hollander claimed not to recall the details of this call, but he admitted the call related to his conversation with Paul Weiss.[179]

On March 22, McKinney circulated the first version of a revised financial model.[180] McKinney did not start with any input from the Company, and he acknowledged that his model would require feedback from Anderson to test the assumptions.[181] Rather, McKinney started with what he described as "some pretty draconian assumptions . . . for March–July of 2020."[182] For example, the model slashed DecoPac's projected 2020 adjusted EBITDA to $28.9 million.[183]

On the morning of March 23, Hollander, Frieder, and Woodward met to discuss DecoPac.[184] By that point, Frieder and Woodward were exploring how to access capital to invest in distressed debt.[185] But the DecoPac transaction posed an obstacle: Kohlberg's Fund VIII was effectively fully committed if the DecoPac sale closed, and Fund IX had

---

[178] *See* JX-954 at 1.

[179] Trial Tr. at 514:1–515:2, 702:3–703:10 (Hollander).

[180] JX-954.

[181] *Id.* at 1.

[182] *Id.*

[183] *Id.* at cell Y46. Kohlberg's original investment memorandum projected 2020 adjusted EBITDA of $51.8 million. JX-694 at 37.

[184] *See* JX-967 at 202. The participants claim that they either cannot recall the meeting or cannot describe it without disclosing privileged information. *See* Trial Tr. at 705:23–707:3 (Hollander); *id.* at 1446:20–1448:5 (Woodward); Frieder Dep. Tr. 210:4–25.

[185] Trial Tr. at 986:12–987:1 (Frieder).

not yet opened.[186] To free up capital, Woodward suggested "splitting Deco [between the two funds] *if we decide we have to own it*."[187] Woodward was thus already characterizing Kohlberg's contractual obligation as an option. At trial, Woodward maintained that he meant that Kohlberg was "evaluating [its] rights and obligations."[188] Even with this characterization, it is clear that Kohlberg was thinking about ways to avoid closing.

Immediately after the March 23 call, Hollander spoke with McKinney and Forrey. McKinney left that meeting with the impression that Hollander had made up his mind to terminate the transaction, stating in an email sent the next day: "Given [Hollander's] tone this morning, it sounds like *we have our mind made up* . . . ."[189]

After the March 23 call, McKinney and Forrey began working on "downside cases." Over the next several hours, they generated "two different downside cases": (i) the "GW Case" or the "Gordon Case"; and (ii) a less pessimistic projection labeled the "Downside #1 Case."[190]

The GW Case, named after Kohlberg's CIO Gordon Woodward, reflected what Forrey and McKinney considered "very grim" assumptions under which DecoPac would effectively cease operating, including: (i) a "[c]omplete shutdown through Q3";

---

[186] *See* JX-1000 at 1–2.

[187] *Id.* at 1 (emphasis added).

[188] *See* Trial Tr. at 1446:1–19 (Woodward).

[189] JX-995 at 1 (emphasis added).

[190] JX-998 at 1.

(ii) "[f]acilities are closed"; and (iii) an "18 month rebound to baseline after that."[191] These assumptions translated to a projected $3.6 million in 2020 adjusted EBITDA, less than 10% of its 2019 total.[192]

Kohlberg's witnesses could not agree on who provided the assumptions for the GW Case. Multiple witnesses claimed credit, and its namesake denied involvement.[193] The clearest testimony on the issue was from Hollander, who explained that the model rested on the assumptions that birthday parties constitute 80% of the demand for DecoPac's products, that COVID-19 would lead to the cancellation of nearly all birthday parties, and that the result would be a collapse in cake purchases for all related occasions for at least two quarters.[194] Aside from personal hunches, the Kohlberg witnesses offered no support for any of these assertions.[195]

---

[191] JX-994 at 1; JX-997 at 3.

[192] *See* JX-998 at cells T46, Y46.

[193] *See* Trial Tr. at 515:22–516:8 (Hollander); *id.* at 12336:24–1237:19 (McKinney*); id.* at 1370:5–8 (Forrey*); id.* at 1450:8–14 (Woodward).

[194] *Id.* at 516:11–517:10 (Hollander); *see also* JX-995.

[195] *See* Trial Tr. at 593:15–596:2, 597:2–14 (Hollander) (testifying that he could not recall "how [he] came up with the nonseasonal parties percentage," "what the assumptions are that went into the nonseasonal parties percentage," anything "about the percentage of birthdays canceled," or anything "about the percentage of canceled seasonal events"); *id.* at 1324:3–12 (Forrey) ("Q. So, Mr. Forrey, what assumptions drove your revisions to the model? A. So my view was that COVID was going to hit the company really hard, just given what we were hearing from [Anderson] and the correlation of, you know, the worst situation with the COVID and the worst situation with company sales. But I thought COVID would only last through May. So I thought that it would whack the company, but COVID would go away and people would go back to having parties.").

35

The second model, the Downside #1 Case, projected $182.8 million in revenue and $37.8 million in 2020 adjusted EBITDA,[196] a result that Kohlberg had previously confirmed would not breach the Financial Covenant.[197] McKinney and Forrey believed at the time that, "[w]ithout weekly sales information from [Anderson] or clarity on whether the operation will be shut down," the Downside #1 Case "could be a good place to start."[198]

The Downside #1 Case, however, was abandoned shortly after it was created; Hollander instructed McKinney not to send it to Woodward.[199] By contrast, the GW Case became the foundation for further discussions among the deal team and further modeling—Hollander began re-labeling the GW Case as the "base case."[200]

### 5. Kohlberg Belatedly Seeks and Then Ignores Input from DecoPac.

Kohlberg called DecoPac's management team for information concerning the Company's actual performance on March 24, after it had already independently reached pessimistic conclusions about DecoPac's future sales.[201]

---

[196] JX-998 at cells Y16, Y46.

[197] *See* supra notes 148–149 and accompanying text.

[198] JX-998 at 1.

[199] *See* JX-961 at 2; JX-965 at 1.

[200] Trial Tr. at 522:8–23 (Hollander); *see* JX-965 at 1.

[201] *See* Trial Tr. at 209:14 –210:4 (Anderson) (testifying that the March 24 call was the "next call" with Kohlberg after the March 17 call).

Anderson believed that the purpose of the call was to discuss an employee's termination, but after a few minutes discussing that employee, the Kohlberg representatives began questioning Anderson about DecoPac's sales between March 17 and March 24.[202]

McKinney told Anderson these questions were necessary because "the *lenders* were asking a bunch of questions."[203] That was false.[204]

Anderson relayed that "call-in orders . . . were down 30 to 40 percent."[205] McKinney's contemporaneous notes reflect that Anderson also told Kohlberg that "[p]re-orders are still shipping out" and that "customers aren't cancelling their pre-orders, but are delaying them."[206]

Following the call, McKinney provided a list of data requests.[207] Kohlberg again represented that they had "been having ongoing dialogue with [their] *lenders*" who had been requesting the information Kohlberg now sought from DecoPac.[208] This statement was inaccurate. The Lenders had not requested the data.

Anderson answered most of the requests on March 25, providing the Company's latest monthly financial results and weekly sales figures for regular orders, only the latest

---

[202] *Id.* at 210:2–212:2 (Anderson).

[203] *Id.* at 211:16–23 (Anderson) (emphasis added); *accord.* JX-1007 at 1.

[204] *See* Trial Tr. at 1272:11–1273:5 (McKinney).

[205] *Id.* at 525:23–526:4 (Hollander); *accord.* JX-319 at 12.

[206] JX-1026 at 1; *see also* Trial Tr. at 523:20–526:4 (Hollander).

[207] JX-1037 at 3.

[208] *See id.* at 2 (emphasis added).

week of which showed any meaningful decline relative to 2019 results.[209] Based on customer feedback, they conveyed that customers anticipated "a return to 'normalcy'" by the end of the summer.[210] Anderson also previewed that Twedell would provide additional information the next day.[211]

Assembling a reforecast on such short notice was a heavy lift for DecoPac's management team, which viewed it as "a fairly extensive exercise" on par with the "budget process, which takes weeks, months, to do."[212] At trial, Twedell described the reforecasting process and the process of preparing the Company's annual budget projections, both of which require involvement from the finance, management, marketing, accounting, and executive teams across DecoPac's businesses.[213]

DecoPac's budgeting process employed a bottom-up approach, which Twedell described as follows:

> It is engaging with the organization to understand not only what's happened up to that point, but what the expectations are through the end of the year, not only from a sales standpoint, understanding what sales programs are in place, what customers are doing, what orders for events might be on the books already, but also then talking to the folks in the organization on where they stand on spending activities, are they still on track to do what they had said they were going to

---

[209] *See* JX-1058.

[210] *Id.* at 2; *accord.* Trial Tr. at 215:1–217:12 (Anderson).

[211] JX-1058 at 1.

[212] Trial Tr. at 342:11–16 (Twedell).

[213] *Id.* at 344:9–347:3, 370:20–373:15 (Twedell). DecoPac's management team had considerable experience with the Company, as the CEO, CFO, and Controller had worked for DecoPac for 24, 21, and 15 years, respectively. *Id.* at 160:8–10, 183:17–184:4 (Anderson).

do in light of the overall plan that they had going into the year
so that we could map out where we think we're going to end.[214]

The forecasting team then supplements those conversations with "[c]ontinued engagement . . . where the product marketing, design development team will meet with the sales force and let them know what's coming up so that they can incorporate that into their plans."[215]  Lastly, the analysis is informed by "[d]iscussions with . . . customers who have been giving them insight as to what programs . . . they plan to do in the coming year."[216]

All of the information described above "would roll up into a sales view that [the Company] would then . . . look at from . . . an overall level" in a "bottoms-up/top-down" analysis of "the business expectations."[217]  According to Twedell, Anderson had "an uncanny awareness of the business" and was extremely adept at creating accurate forecasts.[218]

The Company tasked senior financial analyst Karen Reckard with creating the forecast.[219]  Reckard was uniquely situated to make those projections because she "sits in on the weekly sales call . . . so she can hear and be aware of factors relevant to the marketplace."[220]  Reckard and the DecoPac team proceeded to assemble a reforecast for

---

[214] *Id.* at 371:12–24 (Twedell).

[215] *Id.* at 372:7–13 (Twedell).

[216] *Id.* at 372:14–16 (Twedell).

[217] *Id.* at 372:16–21 (Twedell).

[218] *Id.* at 348:2–9 (Twedell).

[219] *Id.* at 344:11–345:6 (Twedell).

[220] *Id.* at 345:13–22 (Twedell).

March through June.[221]  They followed its annual budget process to accomplish this goal, incorporating "feedback . . . from the customers and the suppliers and the trade," including that customers thought "there's going to be a huge, pent-up demand" because "government orders were going to start to be lifted the Monday after Easter."[222]  They also believed that, regardless of the state of government orders, Americans would find a way to celebrate life events amidst the pandemic and in-store bakeries would find a way to satiate the corresponding the demand for decorated cakes.[223]

Anderson simultaneously worked on a forecast reflecting "his long history with the business, his engagement with the sales team . . . and awareness of the business."[224]  DecoPac's management team then combined Reckard's and Anderson's projections "to decide what the right numbers would be for the reforecast."[225]

Reckard's and Anderson's projections were "very, very close" to one another.[226]  After comparing and combining those projections, Reckard and DecoPac Controller Toby

---

[221] *Id.* at 217:17–219:20 (Anderson); *see also* JX-1066.

[222] Trial Tr. at 217:13–219:11 (Anderson).

[223] *See* JX-1153 at 1.

[224] Trial Tr. at 346:16–347:3 (Twedell).

[225] *Id.* at 347:1–3 (Twedell).

[226] *Id.* at 219:8–11 (Anderson); *see id.* at 348:10–13 (Twedell).  Reckard's bottom-up analysis projected sales declines of 23%, 29%, 33%, and 10% for March, April, May, and June, respectively.  JX-1108 at cells O58, O71, O84, O97.  Anderson projected sales declines of 22%, 30%, 25%, and 15% for March, April, May, and June, respectively.  JX-1042 at cells C31–34.

Opheim "worked on [the reforecast] the remainder of [March] 25th and virtually all day on the 26th" to "flesh things out a little bit more."[227]

The result reflected Reckard's bottom-up and customer-by-customer sales forecast based on research into marketplace activity, sales team communications with customers, and week-by-week comparisons of major customers' 2019 and 2020 orders.[228] It also reflected Anderson's knowledge of the Company's actual performance through most of March, demand changes that the sales team gleaned from customers, and pre-booked orders for April and May.[229]

DecoPac sent its reforecast to Snow Phipps and Kohlberg on the evening of March 26—less than two days after it was requested.[230] Anderson also provided the remaining information that McKinney had requested.[231]

DecoPac's effort was futile; Kohlberg had written off the Company's projections before even seeing the numbers.[232] As Hollander testified, "my reaction to actually

---

[227] Trial Tr. at 219:14–20 (Anderson).

[228] *See id.* at 219:2–7 (Anderson); *id.* at 344:11–348:17 (Twedell).

[229] *Id.* at 215:19–218:23; 294:24–295:3 (Anderson).

[230] *See* JX-1066; JX-1072.

[231] JX-1066; Trial Tr. at 219:14–220:10 (Anderson).

[232] *See* Trial Tr. at 558:2–559:11 (Hollander) (testifying that "a few days prior" to sending the reforecast, DecoPac management informed Kohlberg that "they only reforecasted the second quarter" and that Hollander "didn't think the assumption that COVID would have run its course and we would be back to normal by July was a credible or reasonable assumption at the time"); *id.* at 565:21–566:3 (Hollander) (testifying that, after the March 27 call reviewing the Company's projections, Hollander "*continued* to believe that our forecast was the most well-grounded and appropriate" (emphasis added)).

41

receiving the reforecast was largely similar to the one I had when they previewed what it would look like."[233]

Sure enough, seventeen minutes after DecoPac's reforecast arrived, Hollander dismissed it as "illogically optimistic" in an email to Kohlberg's employees and counsel.[234] Kohlberg never shared this assessment with DecoPac, never sent the Company's reforecast to any of the Lenders, and never incorporated DecoPac's projections into its own model.[235]

### 6. Kohlberg Sends Its Revised Forecast to the Lenders with Financing Demands.

On March 26, while the Company was still in the process of assembling management's reforecast, Kohlberg completed its own new set of projections (the "March 26 Model" or the "Model").

In contrast to the painstaking process undertaken by DecoPac's management, the Model was based on the same simplistic assumptions as the GW Case: widespread birthday party cancellations and facility closures followed by an "18 month rebound to baseline" sales.[236] The Model's forecast was nearly as pessimistic as the GW Case, projecting that the Company's adjusted EBITDA would fall from approximately $48.3

---

[233] *Id.* at 559:5–7 (Hollander).

[234] *See* JX-1120 at 1; JX-1183 at 8.

[235] *See* Trial Tr. at 358:23–359:3 (Twedell); *id.* at 568:2–12 (Hollander); *id.* at 1332:9–1334:15 (Forrey).

[236] *See id.* at 515:22–517:10 (Hollander); *id.* at 1248:16–1251:21 (McKinney).

million for 2019 to $10.5 million for 2020 and thus that the Financial Covenant would be breached on the first day it was tested.[237]

The assumptions underlying the GW Case were largely unexplained and unsupported at trial. According to McKinney, the March 26 Model reflected Hollander's assumptions.[238] But Hollander could not articulate "how [he] came up with the nonseasonal parties percentage," "what the assumptions are that went into the nonseasonal parties percentage," anything "about the percentage of birthdays canceled," or anything "about the percentage of canceled seasonal events," all of which were key assumptions driving the model.[239] Hollander testified that Kohlberg "did not discuss those specific assumptions" with DecoPac's management or "even tell them that those were assumptions that [Kohlberg] had come up with to drive [its] model."[240]

---

[237] *See* JX-1064 at cells N26, S26, S70, S101; Trial Tr. at 492:6–11 (Hollander).

[238] Trial Tr. at 1251:8–21 (McKinney). McKinney was unable to identify the bases for these assumptions. *See id.* at 1251:8–1271:15 (McKinney) ("Q. And you don't recall looking at any data regarding how the in-store sector, in-store bakery sector, of the economy was going to perform when you came up with your predictions about celebrations. Correct, sir? A. Yes. Q. And you didn't consider the possibility of virtual celebrations when you were constructing this modeling at all. Correct, sir? A. I'm not sure that was something that we'd model . . . . Q. Thank you, sir. And you also didn't consider the possibility of at-home celebrations in constructing your modeling either. Correct, sir? A. I'm not sure one way or another, but that sounds right. Q. And you didn't analyze customer trends on a customer-by-customer basis in order to build this model either. Correct, sir? A. Yes, that's right.").

[239] *Id.* at 593:15–596:2 (Hollander).

[240] *Id.* at 597:2–14 (Hollander).

Kohlberg sent the March 26 Model to Ares and Antares, its lead Lenders, before receiving DecoPac's reforecast. Kohlberg described the model as its "current expectations for performance going forward."[241]

Kohlberg paired its model with demands for changes to the DCL. First, Kohlberg sought to increase its revolver from $40 million to $55 million.[242] This decision refers to that request as the "Revolver Demand." Second, Kohlberg sought "an uncapped add-back related to lost revenue from COVID-19."[243]

After sending the March 26 email, Kohlberg modified its request for an uncapped addback to a $35 million addback.[244] For simplicity, this decision refers to the demand for an uncapped addback and the revised demand for a $35 million addback together as the "Addback Demands." Kohlberg also asked for a holiday from testing the Financial Covenant,[245] which this decision refers to as the "Holiday Demand." This decision refers to the demands collectively as the "Financing Demands."

---

[241] *See* JX-1062 at 1; JX-1064 at 1.

[242] JX-1062 at 1; JX-1064 at 1.

[243] JX-1062 at 1; JX-1064 at 1.

[244] Trial Tr. at 549:4–13 (Hollander); *id.* at 796:11–797:18 (Antares).

[245] *See* Ares Dep. Tr. at 117:25–118:4; Antares Dep. Tr. at 163:13–22.

### 7. Kohlberg Conducts a Perfunctory Call with DecoPac.

The day after Kohlberg made the Financing Demands, Kohlberg had its second and final post-signing call with DecoPac management.[246] During the call, DecoPac's management team explained the basis their reforecast.[247]

According to McKinney's contemporaneous notes, Anderson justified why any decline would be temporary, including that "grocery is booming" and, while sales were then down "30% y-o-y," the Company would rebound as consumers came "[o]ut of [the] hoarding mentality" and as grocery stores returned labor from center-store to the bakery aisle.[248] Anderson also relayed his belief DecoPac would remain operational even during government shut-down orders.[249]

Anderson and Twedell felt confident about the call,[250] and Anderson testified that Kohlberg "didn't push back at all on our model or our assumptions."[251] While Kohlberg indicated "in passing" that it had created a more conservative projection to use with the Lenders,[252] it never shared the March 26 Model with DecoPac.[253]

---

[246] *See* JX-1153; Trial Tr. at 227:9–14 (Anderson); *id.* at 357:20–358:3 (Twedell).

[247] JX-1153; Trial Tr. at 228:3–9 (Anderson); *id.* at 358:16–22 (Twedell).

[248] JX-1153 at 1.

[249] *See id.* at 1.

[250] *See* Trial Tr. at 232:9:17–23 (Anderson); *id.* at 358:16–359:3 (Twedell).

[251] *Id.* at 232:9:17–23 (Anderson).

[252] *Id.* at 228:3–18, 295:4 –19 (Anderson); *see id.* at 359:4–360:2 (Twedell).

[253] *See id.* at 366:23–367:21 (Twedell*); id.* at 599:1–600:5, 725:18–726:17 (Hollander); *id.* at 1275:6–1276:13 (McKinney).

### 8. DecoPac Draws on Its Revolver.

During the March 27 conversation, DecoPac's management informed Kohlberg that it had partially drawn on its $25 million revolving credit facility, as it had five times since being acquired by Snow Phipps in 2017.[254] The $15 million revolver draw had arrived in its account the day before.[255] DecoPac explained that it made the draw "in an abundance of caution to hold in reserve"[256] and as part of a Snow Phipps portfolio-wide policy to mitigate counterparty risk.[257] Kohlberg employed the same portfolio-wide policy and had its portfolio companies "pulling down the revolvers just in case there was a credit dislocation that prevented [it] from pulling down on the revolvers at a later date."[258]

DecoPac never spent the $15 million.[259] DecoPac instead made a $10 million repayment on June 25, 2020, and a $5 million repayment on August 26, 2020, fully repaying the loan by August 26, 2020.[260] Anderson testified that had Kohlberg asked, the entire $15 million could "have been paid back right away."[261]

---

[254] *See* PTO ¶ 20; JX-1610; Trial Tr. at 337:16–19 (Twedell); *see also* JX-1153 at 2 (noting in McKinney's notes from the March 27 phone call that DecoPac "[d]id draw on the revolver out of an abundance of caution"); Trial Tr. at 1334:17–23 (Forrey) (testifying that, on the March 27 call, DecoPac "mentioned that they had drawn $15 million on their revolver").

[255] *See* JX-957 at 11; JX-1610 at row 25.

[256] JX-957 at 1; *see* Trial Tr. at 47:22–48:8 (Mantel); *id.* at 230:9–231:7 (Anderson).

[257] Trial Tr. at 48:1–15 (Mantel).

[258] *Id.* at 995:16–997:4 (Frieder).

[259] *Id.* at 61:24–62:4 (Mantel); *id.* at 232:1–5 (Anderson).

[260] JX-1610 at rows 26–27; *see* Trial Tr. at 61:21–23 (Mantel); *id.* at 232:6–8 (Anderson).

[261] Trial Tr. at 232:9–12 (Anderson).

46

### 9. The Lenders Reject Kohlberg's Financing Demands.

Ares and Antares did not react well to the Financing Demands. They deemed them to be "outside of the scope of what was permitted in the [DCL],"[262] such that they would require "opening up the commitment papers" and a "renegotiation of the terms of the final commitment letter."[263] Ares and Antares concluded on March 31, 2020, that while they "were willing to close on the papers as they had been drafted,"[264] they would not accommodate Kohlberg's requests without "opening up the other terms."[265] The only modification that Kohlberg offered was to cap its new addback at $35 million, which was insufficient to "change the view for" Antares.[266]

Both Owl Rock and Churchill had requested an update from Forrey before Kohlberg's outreach to Ares and Antares.[267] Forrey did not respond to either request until after Ares and Antares refused Kohlberg's demands.[268] On March 31, Kohlberg sent Owl Rock and Churchill the March 26 Model despite the rapidly evolving situation and the availability of additional information, including the Company's reforecast, that contradicted the Model.[269]

---

[262] *Id.* at 974:10–15 (Ares).

[263] *Id.* at 791:10–792:1 (Antares).

[264] *Id.* at 965:17–21 (Ares); *accord. id.* at 792:2–8 (Antares).

[265] JX-1195 at 1; *accord.* JX-1184 at 1.

[266] JX-1184 at 1.

[267] *See* JX-1192 at 2–3; JX-1224 at 2.

[268] *See* JX-1192 at 1–2; JX-1224 at 1–2.

[269] *See* JX-1192 at 1, 5; JX-1224 at 1, 4.

Both Owl Rock and Churchill immediately recognized that Kohlberg wanted "add-backs that would be different from what was laid out in the DCL."[270]

In internal communications, an Owl Rock employee stated that "[t]he deal team's initial view is that this model may be draconian" and that "this forecast may be punitive."[271]

In internal communications, Churchill employees reacted to the request as follows:

- "[K]ohlberg hadn't spoken to snow phipps at the time i talked to them . . . but they were likely going to blame the lenders and say 'the financing fell apart.'"[272]

- "*[T]hey changed the ask and risk profile of the deal and were not willing to adjust the economics, so they were really looking for a way out*."[273]

- "[T]hey came back and asked for increased revolver capacity, uncapped addbacks to EBITDA for Covid, and no testing of covenants for a 12 month period."[274]

- "[W]hoa. [I] did not know the covenant relief part. [T]hat is a bold ask . . . *highway robbery*."[275]

Notwithstanding the Financing Demands, each of the Lenders remained committed to funding the transaction under the terms of the DCL. Although the Lenders had their

---

[270] Trial Tr. at 819:7–18 (Owl Rock); *accord.* Churchill Dep. Tr. 70:8–16 (testifying that the requests were for "different terms from those that existed in the DCL").

[271] JX-1383 at 1; *accord.* Trial Tr. at 821:1–822:11 (Owl Rock).

[272] JX-1267 at 1.

[273] *Id.* at 1 (emphasis added).

[274] *Id.* at 1–2.

[275] *Id.* at 2 (emphasis added).

own right to declare an MAE, none of them did so.[276] To the contrary, each confirmed its willingness to proceed under the DCL.[277]

### 10.    Kohlberg Declares Debt Financing No Longer Available.

On April 1, Hollander told Mantel that Debt Financing was no longer available. Hollander and Mantel spoke twice that day.[278] On the first call, Hollander advised Mantel that "that the debt was not going to be there to fund the transaction," which Mantel understood "to mean that the debt commitment parties were not going to meet their obligations."[279] This "surprised" Mantel, prompting him to "go refamiliarize [himself] with the relevant sections in the contract and think about that a bit and talk to [his] partners."[280] On the second call later that afternoon, Mantel sought to "confirm [his] understanding" of the situation, considering Snow Phipps's "perception was that the lenders were being very supportive of what was going on."[281] Hollander responded that the Lenders were "going to meet their commitments under the [DCL]" but that "Kohlberg was requesting additional addbacks in the debt in their credit facility due to the effects of

---

[276] *See* DCL Ex. D ¶ 12; Trial Tr. at 800:10–19 (Antares); *id.* at 816:12–15 (Owl Rock); *id.* at 962:2 –14 (Ares); Churchill Dep. Tr. at 64:15–22.

[277] *See* Trial Tr. at 792:2–8 (Antares); *id.* at 824:5–8 (Owl Rock); *id.* at 965:17–21 (Ares); Churchill Dep. Tr. 44:3–8, 75:21–76:13; *see also* JX-1418 at 1 (confirming Antares's willingness to close); JX-1424 at 1 (confirming Owl Rock's willingness to close).

[278] Trial Tr. at 51:4–53:6 (Mantel); *id.* at 574:19–575:5 (Hollander).

[279] *Id.* at 51:11–19 (Mantel); *see* JX-1242 at 1; Trial Tr. at 575:24–576:2 (Hollander).

[280] Trial Tr. at 51:11–24 (Mantel).

[281] *Id.* at 52:6–24 (Mantel).

COVID and that the lenders were unwilling to do that without reopening the debt commitment papers."[282]

As far as Mantel knew at the time, the Lenders were still prepared to fund.[283] He nevertheless told Hollander to "go ahead if you want to seek alternative financing, but then you need to meet all of your obligations under this contract."[284]

Kohlberg took the position then and in this litigation that, because the "financing markets had been crushed," "there was no way to finance DecoPac on terms no less favorable than the DCL" in early April.[285] Kohlberg maintained this position despite all four Lenders expressing their willingness to close on the DCL's terms.[286]

### 11. Kohlberg Spends Four Days Searching for Alternative Financing.

On April 1, after Mantel told Hollander to seek alternative financing, Hollander contacted Houlihan Lokey to conduct a market check and assess the availability of alternative debt financing.[287] Hollander treated this outreach as a canvassing of the market; he felt that "there would be no better place to get the benefit of not just one or two individual

---

[282] *Id.* at 52:21–53:6 (Mantel); *accord.* JX-1242.

[283] Trial Tr. at 55:4–10 (Mantel).

[284] *Id.* at 55:11–23 (Mantel); *see id.* at 575:8–15, 771:23–772:10 (Hollander).

[285] Defs.' Opening Post-Trial Br. at 57 (quoting Trial Tr. at 579:24–580:9, 581:24–582:14 (Hollander)).

[286] *See supra* note 277 and accompanying text; *see also* Trial Tr. at 52:21–53:6 (Mantel) ("I approached Seth. I said, so these lenders are telling you that they're not going to meet their commitments under the debt commitment papers? And his response to that was, no, they actually are, but that Kohlberg was requesting additional addbacks in the debt in their credit facility due to the effects of COVID and that the lenders were unwilling to do that without reopening the debt commitment papers.").

[287] JX-1265 at 3; Trial Tr. at 576:10–577:3 (Hollander).

lenders, but to get a benefit of what the market was for this type of financing at that time" because "Houlihan Lokey has a group entirely dedicated to raising this type of financing."[288] Kohlberg told Houlihan Lokey that it was "looking for advice . . . on how [it] could finance DecoPac" and sent Houlihan Lokey the March 26 Model—"the same model that [it] had sent to the other lenders."[289]

On April 2, Hollander contacted Madison Capital Funding ("Madison Capital"), an existing lender to DecoPac that had previously "express[ed] interest in participating in the financing."[290] Hollander "called to gauge [Madison Capital's] interest in the DecoPac first lien financing."[291] Madison Capital responded that "financing on terms" Kohlberg sought "were not attractive to Madison Capital," and that the firm had, as of that date, "hit the pause button on new deals" in response to COVID-19.[292]

Madison Capital's corporate representative testified that, as of early April, there was "severe dislocation" and "major pullback" in the credit markets, as well as a "shortage of transactions" and "increased pricing," which was "very, very disruptive."[293] According to

---

[288] Trial Tr. at 577:4–12 (Hollander); *see also id.* at 1589:22–1590:10 (Foster) (testifying that "Houlihan Lokey is probably the most well-known investment banking firm in the middle market," making Kohlberg's outreach "a very efficient and effective way to see if there was alternative financing available" because "by going to Houlihan Lokey, you are essentially going to tens, if not hundreds, of lenders").

[289] *Id.* at 577:13–579:3 (Hollander).

[290] *Id.* at 580:10–581:12 (Hollander); *see id.* at 979:22–980:4 (Madison Capital).

[291] *Id.* at 980:8–11 (Madison Capital); *see also id.* at 581:10–12 (Hollander) ("I reached back out to [Madison Capital] as part of our ongoing evaluation for alternative financing.").

[292] *See id.* at 984:8–16 (Madison Capital).

[293] *Id.* at 982:22–983:4 (Madison Capital).

Madison Capital, no lender would have offered financing on the DCL's terms because credit markets at the time were "largely" frozen and the DCL's pricing and leverage profile "was not attractive on April 2."[294]

On April 3, Houlihan Lokey provided Kohlberg with a market assessment in which it concluded that "there is a high degree of execution uncertainty" in obtaining financing for the deal.[295] To secure financing, Houlihan Lokey indicated that Kohlberg would need to boost its equity stake, increase the interest rate on the loan to LIBOR plus 9–11%, amortize between 3% and 5% of the principal amount of its debt each year, and place four quarters of interest and amortization expense in escrow.[296] Those terms were "materially less favorable" than those in the DCL.[297]

On April 5, Hollander again called Mantel, this time to report that Kohlberg had been "unable to obtain alternative financing" and that Kohlberg "believed that an MAE had occurred," such that Snow Phipps "would be unable to bring down [its] reps and warranties at closing."[298] Kohlberg also "indicated that Paul Weiss was looking into an ordinary course violation."[299] Kohlberg had not provided Snow Phipps a forecast or model

[294] *Id.* at 983:5–15, 984:17–24 (Madison Capital).

[295] JX-1282 at 6.

[296] *Id.* at 7.

[297] Trial Tr. at 579:14–23 (Hollander); *see also id.* at 1590:11–17 (Foster) ("Houlihan Lokey came back with a report and said any alternative financing would be on substantially worse terms than those in the DCL. Among other things, the interest rate would go up; and more equity would be required from Kohlberg.").

[298] *Id.* at 56:21–57:8 (Mantel).

[299] *Id.* at 57:9–13 (Mantel).

to support the existence of an MAE and did not explain what actions "they believed constituted a breach of the ordinary course covenant."[300]

On April 7, Mantel called Hollander to report that, after speaking further with DecoPac's management, he remained confident in the Company's ability to meet all of its closing conditions.[301] Mantel further expressed Snow Phipps's expectation that "they were going to be moving forward towards a closing; and that [they] expected [Kohlberg] to be there to meet their obligations."[302] Mantel confirmed that "the debt parties were there" and even "offered to work with Kohlberg potentially to take back some seller paper to assist with any leverage issue" in the amount of "approximately $25 million of seller paper."[303] Hollander replied that "[t]here was not going to be a closing" and that Kohlberg wouldn't "entertain any discussion of how to facilitate financing for the transaction."[304]

### 12. Kohlberg Determines Not to Proceed to Closing.

On April 8, Kohlberg's counsel told Plaintiffs that Kohlberg would not proceed to closing because Kohlberg did not believe that the Company would meet its conditions to closing and Debt Financing remained unavailable.[305]

---

[300] *Id.* at 59:10–60:5 (Mantel).

[301] *Id.* at 62:5–17 (Mantel).

[302] *Id.* at 62:11–17 (Mantel).

[303] *Id.* 62:18–63:3 (Mantel).

[304] *Id.* at 63:4–10 (Mantel).

[305] Wood Dep. Tr. at 271:21–273:16; *see* JX-1339; JX-1340; *see also* Dkt. 97, Defs.' and Countercl. Pls.' Answer, Defenses, and Verified Countercls. ("Defs.' Answer" and "Countercl. Pls.' Countercls.") ¶ 81 (admitting that Kohlberg's "counsel reiterated that financing was not available . . . , that there had been a Material Adverse Effect . . . , and that the Company had breached its Ordinary Course of Business covenant").

On April 9, Plaintiffs' litigation counsel sent a letter to Paul Weiss stating, in part, that "[t]he Seller Parties have fully met or expect to meet all conditions to closing and are ready, willing, and able to Close."[306]

### 13. Kohlberg Receives Updated Sales Data.

After the March 27 call, Kohlberg communicated with DecoPac infrequently and only by email to request weekly sales data.[307] McKinney asked for weekly sales data for three consecutive weeks, and the Company responded within a few days each time.[308] Kohlberg received near real-time data concerning the last fiscal week of March and the first two fiscal weeks of April.[309]

McKinney received the sales data from the second fiscal week of April on April 13.[310] The data showed that one of DecoPac's facilities had generated $3.4 million in revenue during the first two fiscal weeks of April.[311] Kohlberg's March 26 Model had projected $2.9 million in revenue for that facility for the *entire month of April*.[312] Kohlberg's projections were dead wrong, yet Kohlberg did not update the Model nor contact the Lenders with updates in response to this information.[313]

---

[306] PTO ¶ 22.

[307] *See* Trial Tr. at 366:23–367:3 (Twedell).

[308] *See* JX-1210 at 1 (McKinney's March 30 request); JX-1365 at 3–4 (Forrey's April 3 and April 10 requests).

[309] *See* JX-1210; JX-1365.

[310] JX-1365.

[311] *See id.* at 10; Trial Tr. at 1263:9–22 (McKinney).

[312] DDX-1.9; Trial Tr. at 1265:14–20 (McKinney).

[313] *See* Trial Tr. at 1391:12–1392:4 (Forrey).

### G. Plaintiffs File This Litigation.

On April 14, 2020, Plaintiffs filed this action seeking specific performance of the SPA.[314] They initially sought a trial on the merits of their claim on or before May 2, 2020.[315] The May 2 date was selected to allow time for the Court to resolve Plaintiffs' claim in advance of the May 12 expiration of the DCL.[316] Dubious that a case of this nature could be litigated to trial over two weeks on a clear day, let alone amid the on-going pandemic, the court initially denied expedition.[317]

### H. Kohlberg Terminates the SPA.

On April 20, 2020, Kohlberg sent a letter to Plaintiffs purporting to terminate the SPA pursuant to Section 8.1(d).[318] Kohlberg cited two broad grounds for termination.

First, Kohlberg stated that "notwithstanding our efforts to arrange for alternative financing, the full proceeds of the Debt Financing have not been and will not be funded on the terms set forth in the [DCL]."[319]

Second, Kohlberg stated that the Company "breached representations, warranties and covenants," including the MAE Representation, the Top-Customer Representation,

---

[314] Dkt. 1, Verified Compl. for Specific Performance of, and Declaratory Relief in Connection with, Stock Purchase Agreement and Equity Commitment Letter.

[315] Dkt. 32, Tr. of Apr. 17, 2020 Telephonic Oral Arg. and Rulings of the Ct. on Pl.'s Mot. to Expedite at 51 (The Court).

[316] *Id.* at 20–21 (Plaintiffs' Counsel); *id.* at 50–51 (The Court).

[317] *See id.* at 55–56 (The Court).

[318] JX-1396.

[319] *Id.* at 1.

and the Ordinary Course Covenant.[320] Kohlberg took the position that those alleged breaches could not be cured.[321]

Termination of the SPA had a domino effect under the parties' contractual scheme. The DCL provided that the valid termination of the SPA would result in the immediate, automatic termination of the DCL and the Lenders' commitments and undertakings thereunder.[322] The ECL and Limited Guarantee also provided that the valid termination of the SPA would result in the immediate, automatic termination of the ECL and Limited Guarantee.[323] Thus, Kohlberg maintains that all of its contractual obligations terminated as of April 20.

On April 22, Plaintiffs identified numerous deficiencies in Kohlberg's purported termination notice and offered to repay the revolver draw.[324] Kohlberg did not respond. On April 29, Snow Phipps sent another letter irrevocably confirming its readiness and ability to close.[325] Kohlberg refused to close.

### I. Plaintiffs Amend Their Complaint.

Plaintiffs amended their complaint on May 5, 2020,[326] asserting four Counts:

---

[320] *Id.*

[321] *Id.*

[322] DCL ¶ 15.

[323] *See* ECL ¶ 3; Limited Guarantee ¶ 8.

[324] JX-1406.

[325] JX-1444 at 2–3.

[326] Dkt. 34, Verified Am. Compl. ("Am. Compl.").

In Count I, Plaintiffs claim that KCAKE breached its obligations under Section 6.15 to use commercially reasonable efforts in connection with the Debt Financing, by making the Financing Demands, failing to secure alternative financing, and not promptly notifying Plaintiffs regarding the Debt Financing issues. Plaintiffs seek specific performance of Section 6.15 under Section 11.14 of the SPA. Plaintiffs also seek monetary damages in the alternative.[327]

In Count II, Plaintiffs claim that KCAKE breached the implied covenant of good faith and fair dealing in the SPA by failing to "actively preserve the terms of the [DCL] and the availability of financing."[328]

In Count III, Plaintiffs claim that the Kohlberg Funds breached their obligations under the ECL and seek specific performance under the ECL and Section 11.14(b) of the SPA.[329]

In Count IV, Plaintiffs seek declaratory judgments that (a) KCAKE's failure to consummate the transaction by May 4, 2020, breached its obligations under Section 6.15 of the SPA and (b) KCAKE's "obligations under the SPA require it to proceed to Closing."[330]

---

[327] *Id.* ¶¶ 112–24.

[328] *Id.* ¶¶ 125–33.

[329] *Id.* ¶¶ 134–41.

[330] *Id.* ¶¶ 142–48.

In addition to the declaratory relief requested in Count IV, Plaintiffs seek two remedies: specific performance of the SPA and damages, with damages being contingent on specific performance being unavailable.[331]

On May 12, 2020, the DCL expired by its own terms. In anticipation of this, Plaintiffs renewed their motion to expedite on May 11, 2020.[332] On May 21, 2020, the Court ordered expedited proceedings toward a January 2021 trial.[333]

Kohlberg answered the Amended Complaint on June 18, 2020.[334] With the Answer, Kohlberg asserted three counterclaims:

In Counterclaim I, Kohlberg seeks a declaration that it rightfully terminated the SPA on the basis of an MAE, that Kohlberg validly terminated the SPA, and that Plaintiffs "are entitled to receive no relief other than, at a maximum, the Termination Fee and Other Costs (as defined in the SPA)."[335]

---

[331] *Id.* at Prayer for Relief ¶¶ 1–2, 4–5. Plaintiffs also sought "[a]n Order granting Plaintiffs' request for expedited proceedings." *Id.* ¶ 3. As discussed below, the court addressed that request separately, and this matter has since proceeded on a highly expedited basis.

[332] Dkt. 40, Pls.' Mot. for Expedited Proceedings.

[333] *See* Dkt. 92, May 21, 2020 Tr. of the Telephonic Bench Ruling on Pls.' Mot. to Expedite at 8–9; Dkt. 93, The Parties' Stipulation and Scheduling Order. The court set an August 3, 2020 date for a hearing on Kohlberg's partial motion to dismiss. *See* Dkt. 77, Stipulation and Order Governing Briefing on Defs.' Partial Mot. to Dismiss ¶ 4.

[334] *See* Defs.' Answer.

[335] Countercl. Pls.' Countercls. ¶¶ 90–91. Defendants' and Counterclaim-Plaintiffs' Answer, Defenses, and Verified Counterclaims referred to each of the counterclaims as "Counts." This decision refers to them as "Counterclaims" for ease of reference.

In Counterclaim II, Kohlberg claims that Plaintiffs breached the representations and warranties under the SPA and seeks damages.[336]

In Counterclaim III, the Kohlberg Funds seek declaratory relief that they have no funding obligations and that Plaintiffs are not entitled to specific performance under the ECL.[337]

Kohlberg filed a partial motion to dismiss the Amended Complaint on June 18, 2020, seeking dismissal of all claims asserted in the Amended Complaint except those that mirror Defendants' Counterclaims for declaratory relief.[338] The court largely denied that motion on October 16, 2020 (the "Motion to Dismiss Bench Ruling").[339] The court granted the motion as to Count II because Plaintiffs' implied covenant claim was duplicative of their breach of contract claim.[340] The court also held that Plaintiffs cannot recover damages in excess of the Termination Fee and that Plaintiff may obtain specific performance of the SPA under the prevention doctrine if it is determined that Kohlberg's actions caused the unavailability of Debt Financing.[341]

---

[336] Countercl. Pls.' Countercls. ¶¶ 92–100.

[337] *Id.* ¶¶ 101–02.

[338] Dkt. 98, Defs.' Mot. to Dismiss Pls.' Verified Am. Compl.; *see also* Dkt. 99, Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Pls.' Verified Am. Compl. ("Defs.' Mot. to Dismiss Opening Br.").

[339] Dkt. 221, October 16, 2020 Telephonic Bench Ruling on Defs,' Mot. to Dismiss ("Mot. to Dismiss Bench Ruling").

[340] *Id.* at 28.

[341] *Id.* at 36–37, 50.

## J.    DecoPac and the Debt Markets Recover.

As DecoPac's management predicted, the Company's outlook began improving in mid-April.  In other words, the Company's March reforecast proved accurate.[342]  The Company had projected year-over-year Q2 revenue and adjusted EBITDA declines of 29.5% and 51.9%, respectively, and it achieved results of 28.9% and 46.7%, respectively.[343]  DecoPacs's 2020 year-end results paint a similar picture.  DecoPac "exceeded the [$]44.3 million estimate on the reforecast" and anticipated a "Q4 EBITDA of [$]9.6 [million]."[344]  A month-by-month comparison shows the gap narrowing between 2019 and 2020 sales; the Company's sales were down from 2019 levels by 12.8% in June and only by 2.9% in November.[345]  December 2020 sales exceeded December 2019 sales by 3.7%.[346]  By year end, DecoPac sales were down only 14% year-over-year, safely within the covenant compliance window of Kohlberg's shock case.[347]

The Company's outlook remains positive.  DecoPac's "customers are back to work in the bakery, placing their orders, meeting consumer demand."[348]  At trial, Twedell

---

[342] *See* JX-2432.

[343] *Compare* JX-1120 at 8, *and* JX-182, *with* JX-1933, *and* JX-1717, *and* JX-182.

[344] Trial Tr. at 376:1–5 (Twedell).

[345] JX-1942 at column S.

[346] *Id.* at cell S69.

[347] PDX-5; *see* JX-182; JX-805; JX-1717.

[348] Trial Tr. at 376:22–24 (Twedell).

previewed a "first-look" of the 2020 actual results and the 2021 projected budget, which the Company generated through its regular annual budget process described above.[349]

The budget "account[s] for the role that coronavirus might play going forward" by incorporating trends from the fourth quarter of 2020, anticipating no "dramatic shift[s] from what's been happing" and "improvements later in the year."[350] The Company expects to return to growth in 2021, with revenue projected at "18 percent above [the] 2020 forecast" and "achieving . . . the 2019 actual revenue levels."[351] The Company further expects adjusted EBITDA of $44.2 million, representing a 24.1% increase from 2020 projections and only a 5.9% decrease from 2019 actual EBITDA.[352]

Debt markets also recovered.[353] Compared to when the DCL was signed, "both the number of loans and dollar volume of loans in the month of December actually far outstrip[ped] the activity on a monthly basis during Q1" and the "cost of capital, the interest rate for middle market loans [is] equal to and in some cases lower . . . and, similarly, with leverage ratios and other key lending variables."[354] Indeed, "the market is open and

---

[349] *Id.* at 378:20–380:21 (Twedell).

[350] *Id.* at 381:20–302:4 (Twedell).

[351] *Id.* at 380:24–381:3 (Twedell).

[352] *See* JX-1940 at 1; *see also* Trial Tr. at 381:6–10 (Twedell) (comparing 2021 projections to 2020 forecasted results and 2019 actual results).

[353] Trial Tr. at 1450:21–23 (Woodward).

[354] *Id.* at 1161:1–17 (Bedrosian).

offering loans to middle market companies like DecoPac on terms . . . economically equal to where they were back in Q1" of 2020.[355]

In December 2020, Snow Phipps obtained an indication of interest from Benefit Street Partners LLC ("Benefit Street") to serve as a lender, which it shared with Kohlberg.[356]  Although the Benefit Street term sheet is only a "starting point of a negotiation," it "provides at the senior level and the revolver level of financing ample debt capital to finance the transaction and leaves open the ability for the overall deal to get done."[357]  In the same letter, Snow Phipps formally documented its interest in providing Kohlberg with market-rate financing to help create a package "sufficient to pay the amounts required to be paid under the SPA, to be used for the purpose of facilitating KCAKE's acquisition of DecoPac."[358]

## II.    LEGAL ANALYSIS

Plaintiffs assert claims for breach of the SPA, and Kohlberg's counterclaims present issues raised by Plaintiffs' claims.[359]  The court's task is to interpret the SPA in a way that effectuates the parties' intent.[360] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the

---

[355] *Id.* at 1161:18–1162:1 (Bedrosian).

[356] JX-1921.

[357] Trial Tr. at 1163:12–1164:7 (Bedrosian).

[358] JX-1921 at 3.

[359] *Compare* Am. Compl., *with* Countercl. Pls.' Countercls.

[360] *E.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

agreement as a whole and giving effect to all its provisions."[361]  The contract terms will be given "plain, ordinary meaning."[362]  "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[363]  The court must "reconcile all the provisions of the instrument" if possible.[364]

Applying these principles, this analysis first addresses Plaintiffs' claim that Kohlberg improperly terminated the SPA under Section 8.1.  It turns next to Plaintiffs' claim that Kohlberg breached its obligation under the SPA to use reasonable best efforts to obtain Debt Financing or obtain alternative financing under Section 6.15.  It last addresses whether Plaintiffs are entitled to specific performance under Section 11.14.

### A.  Improper Termination

Kohlberg justifies its termination on three grounds.

First, Kohlberg argues that the Bring-Down Condition failed due to the inaccuracy of the MAE Representation, where the Company represented and warranted that "since December 28, 2019, there has not been any event, change, circumstance, occurrence, effect,

---

[361] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[362] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[363] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord. HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[364] *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

state of facts, development or condition that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."[365]

Second, Kohlberg argues that the Bring-Down Condition failed due to the inaccuracy of the Top-Customers Representation, where the Company represented and warranted that none of DecoPac's top-ten customers had stopped or materially decreased its rate of business with DecoPac since December 31, 2019. For an inaccuracy in the Top-Customers Representation to justify termination, it must "have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."[366]

Third, Kohlberg argues that the Covenant Compliance Condition failed due to the Company's failure to comply with the Ordinary Course Covenant.[367] For breach of the Ordinary Course Covenant to justify termination, the deviation from ordinary course must have been "in all material respects."[368]

### 1. MAE Representation

Kohlberg argues that the MAE Representation became inaccurate because DecoPac's "performance fell off a cliff" as a result of the escalating COVID-19

---

[365] SPA § 3.9(a). Kohlberg argues that, at the time Kohlberg purportedly terminated the SPA, DecoPac "would reasonably be expected to have" suffered an MAE, as opposed to arguing that it had actually suffered an MAE. Defs.' Post-Trial Opening Br. at 86. Either are sufficient to cause the MAE representation to fail.

[366] *See* SPA § 7.1(a).

[367] *Id.* § 6.1(a).

[368] *See id.* § 7.1(b).

pandemic.[369]  Kohlberg maintains that the resulting change had or would reasonably be expected to have a material adverse effect, rendering the MAE Representation false.

The SPA defines an MAE in relevant part as "any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts that, individually or in the aggregate, . . . has had or would reasonably be expected to have a material adverse effect upon the financial condition, business, properties or results of operations of the Group Companies, taken as a whole."[370]

---

[369] Defs.' Post-Trial Opening Br. at 86.

[370] SPA § 1.1.  A few aspects of this definition warrant clarification.

First, the nesting of the defined term "Material Adverse Effect" within the MAE Representation results in two levels of expectancy. The MAE Representation asks whether an event has occurred which had, or would reasonably be expected to have, individually or in the aggregate, an MAE.  The SPA then defines an MAE in relevant part as "any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts that, individually or in the aggregate, . . . has had or would reasonably be expected to have a material adverse effect upon the financial condition, business, properties or results of operations of the Group Companies, taken as a whole."  *Id*.  Read literally, the MAE Representation becomes false if an event has had or would reasonably be expected to have an effect that has had or would reasonably be expected to have a material adverse effect. Following the parties' lead, this decision construes the double-expectancy language as requiring a singular inquiry, which asks whether an event occurred that has had or would reasonably be expected to have a material adverse effect upon the financial condition, business, properties, or results of operations of DecoPac.

Second, while recognizing that the prepositional phrase "upon the financial condition, business, properties, or results of operations" may be a carefully crafted one, *see generally* Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[9] (2020 ed.), it does not play a meaningful part in this analysis.  This decision thus at times omits the phrase for simplicity or shortens it to "DecoPac" given the breadth of the term "business."

Third, as is typical with MAE clauses, the defined term "Material Adverse Effect" incorporates the undefined term "material adverse effect."  *See generally Akorn, Inc. v. Fresnius Kabi AG*, 2018 WL 4719347, at *48–50 (Del. Ch. Oct. 1, 2018), *aff'd*,

As is typical, the SPA's definition of an MAE enumerates a series of exceptions, one of which is relevant to this case: an MAE "shall not include any . . . change . . . arising from or related to . . . (v) changes in any Laws, rules, regulations, orders, enforcement policies or other binding directives issued by any Governmental Entity, after the date hereof."[371]

As is also typical, the MAE exceptions are subject to an exclusion. The exceptions do not apply "to the extent that such matter has a materially disproportionate effect on the Group Companies, taken as a whole, relative to other comparable entities operating in the industry in which the Group Companies operate."[372]

This complicated contractual scheme calls for a three-part burden allocation. Kohlberg bore the initial, heavy burden of proving that an event had occurred that had or would reasonably be expected to have a material adverse effect on DecoPac.[373] If Kohlberg met that burden, then Plaintiffs bear the burden of proving that the relevant event fell within the exception because it arose from or was "related to" any "changes in any Laws, rules, regulations, orders, enforcement policies or other binding directives issued by any

---

198 A.3d 724 (Del. 2018) (TABLE). This decision interprets the use of the undefined term as calling for a predominantly fact-driven inquiry to be undertaken by the presiding judge. *See id.*

[371] SPA § 1.1.

[372] *Id.*

[373] *See, e.g.*, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *55 (Del. Ch. Nov. 30, 2020); *Akorn*, 2018 WL 4719347, at *48–49; *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *16, *25, *28 (Del. Ch. Dec. 18, 2019).

Governmental Entity, after the date hereof."[374]  If Plaintiffs proved that the event fell within the exception, then Kohlberg bore the burden of demonstrating the exclusion to the exception applied because the change affected DecoPac disproportionately relative to other comparable entities operating in the industry.[375]

### a. Was there an event that had or would reasonably be expected to have a material adverse effect on DecoPac?

Merger agreements typically include MAE clauses because "a significant deterioration in the selling company's business between signing and closing may threaten the fundamentals of the deal."[376]  "The typical MAE clause allocates general market or industry risk to the buyer, and company-specific risks to the seller."[377]

---

[374] *See* SPA § 1.1; *AB Stable*, 2020 WL 7024929, at *51 (holding that, if an effect was proved by buyer to be material and adverse, "Seller had the burden to prove that the source of the effect fell within an exception"); *Akorn*, 2018 WL 4719347, at *59 n.619 (collecting authorities and holding that, if a buyer proves that an effect is material and adverse, the seller then bears "the burden of proving that the cause of the decline fell into one of the exceptions in the MAE definition").

[375] *See Akorn*, 2018 WL 4719347, at *59 n.619 (collecting authorities and holding that, if a seller proves that a cause falls within an MAE exception, the buyer then bears the burden of showing that the seller's "performance was disproportionate to its peers, bringing the case within an exclusion from the exception").

[376] *Akorn*, 2018 WL 4719347, at *47.

[377] *Id.* at *49; *see also id.* at *3 ("In prior cases, this court has correctly criticized buyers who agreed to acquisitions, only to have second thoughts after cyclical trends or industrywide effects negatively impacted their own businesses, and who then filed litigation in an effort to escape their agreements without consulting with the sellers.  In these cases, the buyers claimed that the sellers had suffered contractually defined material adverse effects under circumstances where the buyers themselves did not seem to believe their assertions.").

There is no "bright-line test" for evaluating whether an event has caused a material adverse effect.[378] To assess whether a financial decline has had or would reasonably be expected to have a sufficiently material effect, this court will look to "whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period."[379] The target's historical performance often plays an important role in determining whether the effect is sufficiently material by supplying a baseline comparison.[380]

What constitutes durational significance is also context specific.[381] "A short-term hiccup in earnings should not suffice" to constitute a material adverse effect.[382] The effect "should be material when viewed from the longer-term perspective of a reasonable acquiror."[383] Generally, it is expected that the "commercially reasonable period" will be "measured in years rather than months."[384]

---

[378] *See Channel Medsystems*, 2019 WL 6896462, at *34.

[379] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008).

[380] *See, e.g.*, *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 66–70 (Del. Ch. June 18, 2001).

[381] *See Channel Medsystems*, 2019 WL 6896462, at *34; *Hexion*, 965 A.2d at 738.

[382] *IBP*, 789 A.2d at 68.

[383] *Id.*; *see Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *23 (Del. Ch. June 26, 2017).

[384] *Hexion*, 965 A.2d at 738 (holding that, for a decline in earnings to constitute a material adverse effect, "poor earnings results must be expected to persist significantly into the future"); *see also id.* at 745 ("[A]n MAE is to be determined based on an examination of [the company] taken as a whole.").

Where, as here, an MAE clause allows a buyer to terminate the agreement if an event can "reasonably be expected to have a material adverse effect," the defendant is not required to prove that the event in fact had a material adverse effect.[385]

> The "reasonably be expected to" standard is an objective one. When this phrase is used, "[f]uture occurrences qualify as material adverse effects." As a result, an MAE "can have occurred without the effect on the target's business being felt yet." Even under this standard, a mere risk of an MAE cannot be enough. "There must be some showing that there is a basis in law and in fact for the serious adverse consequences prophesied by the party claiming the MAE." When evaluating whether a particular issue would reasonably be expected to result in an MAE, the court must consider "quantitative and qualitative aspects." "It is possible, in the right case, for a party . . . to come forward with factual and opinion testimony that would provide a court with the basis to make a reasonable and an informed judgment of the probability of an outcome on the merits."[386]

In this case, Kohlberg did not attempt to prove that the event "*had . . . a material adverse effect,*" and for good reason. Generally, scholars have commented that "most courts which have considered decreases in profits in the 40% or higher range" have found a material adverse effect.[387] This court has speculated that "a decline in earnings of 50% over two consecutive quarters would likely be an MAE," and "[c]ourts in other

---

[385] *Channel Medsystems*, 2019 WL 6896462, at *15; *Akorn*, 2018 WL 4719347, at *63–65.

[386] *Akorn*, 2018 WL 4719347, at *65.

[387] *Akorn*, 2018 WL 4719347, at *53 (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[9], at 11-66 (2018 ed.)).

jurisdictions have reached similar conclusions."[388]   DecoPac's performance over the two quarters preceding termination were nowhere near that range.   DecoPac's Q4 2019 EBITDA increased 15% year-over-year, and its Q1 2020 EBITDA decreased 16% year-over-year.[389]

Kohlberg instead argues that, at the time of termination, DecoPac's decline in sales would reasonably be expected to have a material adverse effect.[390]   Kohlberg relies on DecoPac's sales data during the five weeks preceding termination.   During that time, DecoPac's regular sales (as opposed to preorder exclusions placed months in advance) suffered year-over-year declines of 42.4%, 63.9%, 60.3%, 62.2%, and 53.4%.[391]   These declines are dramatic when viewed against the baseline of DecoPac's historical stability and resilience in negative markets.[392]   Kohlberg contends that it was reasonable to expect that these declines would continue and ultimately threaten the overall earnings potential of DecoPac.

---

[388] *Id.* (citing *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326, at *5 (Del. Ch. Dec. 4, 1990)) (collecting cases).

[389] *See* JX-69 at 4; JX-182 at 4; JX-1933 at 4.

[390] *See* SPA § 1.1.

[391] JX-2432 at Q15–19; DDX-3.25.

[392] Trial Tr. at 1337:15–21 (Forrey); *see also id.* at 137:5–8 (Mantel) (testifying that during "[t]he last couple of recessions, [the business] actually grew"); *id.* at 179:13–20 (Anderson) ("Q.  Did you work at DecoPac during 9/11 and the 2008 financial crisis?  A.  Yes, I did. Q.  And did you experience DecoPac sales decreasing during those events of dislocation? A.  There was a short downturn after 9/11.  But during the 2008 recession, we actually grew sales slightly over the period 2008 to 2009, '10."); Austin Smith Dep. Tr. at 284:8– 10 (testifying that, going back to 2015, she was "not aware of double-digit monthly declines" at DecoPac).  *But see* Austin Smith Dep. Tr. at 265:21–266:3 (testifying that there was no "historical precedent for" the volatility that DecoPac experienced in 2020).

Kohlberg relies on its grocery expert, Joseph Welsh, who testified that widespread industry changes occurring prior to termination made it reasonable to expect as of April 20 that DecoPac would experience a material adverse effect.[393] Welsh testified that in-store bakeries were transitioning from custom cakes, which require on-site preparation and may incorporate DecoPac's products, to competing thaw-and-sell cakes, which do not.[394] According to Welsh, the thaw-and-sell industry "just exploded" during the pandemic, with continued, "astonishing" growth to date.[395] Given that thaw-and-sell products do not require skilled bakery labor and that customers are able to buy them without engaging with store personnel, selling more thaw-and-sell cakes has allowed grocery stores to cut labor costs during the pandemic and has coincided with customers' new preferences.[396]

Welsh's thaw-and-sell theory is flawed because it fails to account for the in-roads that DecoPac is already making into the thaw-and-sell business. Although DecoPac does not produce thaw-and-sell cakes that arrive at stores pre-finished and ready for sale, it does supply ingredients and products to companies that produce thaw-and-sell cakes.[397] By 2019, DecoPac had begun allocating more resources to this area of its business, with plans

---

[393] Trial Tr. at 1507:15–1508:6, 1514:17–1515:3 (Welsh).

[394] *Id.* at 1487:22–1490:3, 1497:10–16 (Welsh).

[395] *Id.* at 1497:20–24 (Welsh).

[396] *Id.* at 1489:16–1490:3, 1497:10–16, 1498:1–8 (Welsh).

[397] Gardner Dep. Tr. at 55:11–60:19.

to kick off additional programs with vendors in Q1 or Q2 of 2021.[398] Welsh did not account for this aspect of DecoPac's business.

Welsh further testified that the pandemic caused significant changes in the ways that consumers shop for groceries, including online ordering and curbside pick-up, which reduces traffic inside the store and thereby reduces opportunities for customers to buy cakes decorated with DecoPac products.[399] In Welsh's view, these industry changes are "sticky"—i.e., having implemented operational changes, stores are unlikely to reverse their decisions.[400] Welsh's report concludes that, as of April 2020, it would have been reasonable to expect a 30.6% decline in DecoPac's sales through 2020, "with this decrease likely to persist through at least 2021."[401]

Welsh's conclusion that DecoPac's sales would remain completely flat for the months of April 2020 through December 2020 was not reasonable in light of the upward trend reflected in DecoPac's weekly sales prior to termination. As acknowledged in Welsh's report, declines in DecoPac's weekly sales in the U.S. over the weeks of April 4, April 11, and April 18 were 55.5%, 41.9%, *and 15.4%* year-over-year, respectively.[402]

---

[398] *Id.* at 56:20–60:15.

[399] Trial Tr. at 1498:21–1499:23 (Welsh); DDX-3.24.

[400] JX-2408 ¶ 56; *see* Trial Tr. at 1498:9–20.

[401] JX-2408 ¶¶ 113–14 ("It is my expert opinion that as of March/April 2020, it would have been expected that DecoPac would lose a substantial amount of sales and profitability and that this would continue, in all probability, for a sustained period given the new retail shopping environment created by the pandemic."); *see* Trial Tr. at 1508:20–1511:16 (Welsh); DDX-3.29.

[402] JX-2408 Am. Ex. 8.

Welsh's report also runs contrary to projections prepared prior to termination. Although the "would reasonably be expected to have" standard is indifferent to the subjective beliefs of the parties as of April 20,[403] the parties' contemporaneous forecasts inform the analysis of what was objectively reasonable to expect at the time of termination.[404] Generally, "contemporaneous management projections prepared in the ordinary course of business" are the best source for "reliable projections of future expected cash flows."[405] Although DecoPac management's reforecast was not prepared in the ordinary course of business, management followed the same reliable process, using inputs and assumptions derived from real-time data concerning DecoPac's financial performance. Management's reforecast projected that 2020 revenue would be down 11% compared to

---

[403] At times in briefing, Kohlberg phrased the inquiry as what "*Kohlberg* reasonably expected," *see, e.g.,* Defs.' Opening Post-Trial Br. at 86, 88, 92 (emphasis added), but this is not the standard. *See, e.g., Akorn*, 2018 WL 4719347, at *65 ("The 'reasonably be expected to' standard is an objective one.").

[404] *See id.* at *55 (considering, in assessing whether an MAE was reasonably expected, contemporaneous management discussions of the potential long-term impact of the effects); *Hexion*, 965 A.2d at 743 (considering projections included in buyer's pre-signing financial models in assessing whether an MAE was reasonably expected); *cf. Channel Medsystems*, 2019 WL 6896462, at *32 (describing qualitative MAE theories as "consist[ing] of seemingly after-the-fact rationalizations" and "highly speculative" where "[t]here [was] not a single scrap of paper that [the defendant] actually analyzed any of these risks when [it] made the termination decision"); *IBP*, 789 A.2d at 65 ("[I]t is useful to be mindful that Tyson's publicly expressed reasons for terminating the Merger did not include an assertion that IBP had suffered a Material Adverse Effect. The post-hoc nature of Tyson's arguments bear on what it felt the contract meant when contracting, and suggests that a short-term drop in IBP's performance would not be sufficient to cause a MAE.").

[405] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *31 (Del. Ch. July 21, 2017) (quoting *In re PetSmart, Inc.*, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017)).

the original 2020 budget (an adjustment from $215.9 million to $191.9 million), and

EBITDA would be down 22% (an adjustment from $51.9 million to $40.4 million).[406]

Kohlberg's Downside #1 Case, which McKinney and Forrey viewed as "a good place to start,"[407] bore a close resemblance to management's reforecast. It projected that, compared to the original 2020 budget, revenue would be down 15% (to $182.8 million) and EBITDA would be down 27% (to $37.8 million).[408] It further projected that year-end 2021 revenue and adjusted EBITDA would be 2% and 5% higher, respectively, than they were in 2019.[409]

The parties' more reliable contemporaneous projections, therefore, show that it was not reasonably expected that DecoPac's sales decline would ripen into a material adverse effect.[410]

---

[406] *Compare* JX-1120 at 5–9, *with* JX-465 at cells AD21, AD55. Management's reforecast did not project financial results past December 2020. *See* JX-1120 at 5–9.

[407] JX-998 at 1.

[408] *Compare id.* at cells Y16, Y46, *with* JX-465 at cells AD21, AD55.

[409] JX-998 at cells T16, T46, AD16, AD46.

[410] The March 26 Model is not a reliable forecast under an objectively reasonable standard given the circumstances under which it was prepared, as discussed *supra* Sections I.F.4–6. Even crediting the March 26 Model, it does not provide clear support for Kohlberg's argument because it projects a gradual rebound, with Q3 2021 adjusted EBITDA surpassing Q3 2019 adjusted EBITDA, 2022 adjusted EBITDA exceeding 2019 adjusted EBITDA, and continued growth in the years thereafter. *See* JX-1064; *see also* Trial Tr. at 1298:23–1299:3 (Forrey) (testifying that the March 26 Model "showed the company with ample liquidity and access to cash to operate its business," which "in a practical sense [is] what really matters"); *id.* at 1300:14–19 (Forrey) (testifying that "*[t]he company is, like, going to be okay through this period*" (emphasis added)).

The March 26 Model better supports the finding that DecoPac's sales decline would reasonably be expected to have a material adverse effect if the effect is measured in months

This court's decisions in *IBP* and *Akorn* provide helpful benchmarks confirming that it was not reasonable to expect that DecoPac's decline in sales would mature into a material adverse effect.

In *IBP*, the seller experienced a 64% decrease in year-over-year first quarter earnings due to severe winter weather that adversely affected livestock supplies.[411] By the termination date, however, the seller "had two weeks of strong earnings that signaled a strong quarter ahead."[412] Further, "the analyst community was predicting that IBP would return to historically healthy earnings" the following year.[413] The court concluded that "the business appears to be in sound enough shape to deliver results of operations in line with the company's recent historical performance."[414] The court thus held that a material adverse effect was not reasonably expected.[415]

---

rather than years. Such a short-term measurement, however, is contrary to this court's general directive. *See, e.g.*, *Mrs. Fields*, 2017 WL 2729860, at *23 (holding that "[i]n an acquisition, where the buyer acquires the assets of a business outright and the cash flows they generate in perpetuity, one would think that a commercially reasonable period would be measured in years rather than months" (cleaned up)).

For this reason, Kohlberg argues that, in a debt-financed acquisition, the timeframe for evaluating durational significance should align with the timing of post-closing covenant compliance testing. Kohlberg's argument effectively invites the court to view private equity transactions dissimilarly from strategic acquisitions when interpreting an MAE, an idea that is the subject of a wealth of scholarly commentary that the parties neither cited nor discussed. This decision flags the issue without engaging in it given the irrelevance of the March 26 Model to this part of the analysis.

[411] *IBP*, 789 A.2d at 22.

[412] *Id.* at 70.

[413] *Id.*

[414] *Id.* at 71.

[415] *Id.* at 68–72.

In *Akorn*, the only case in which this court found a material adverse effect to be reasonably expected, the seller's EBITDA had grown each year from 2012 through 2016, but it fell by 55% after the merger agreement was signed in 2017.[416] The buyer sent the seller a notice of termination in early 2018.[417] According to the seller's management, the downturn had "already persisted for a year and show[ed] no sign of abating."[418] Analyst estimates for the seller's 2018, 2019, and 2020 EBITDA were lower than those at the time of signing by 62.6%, 63.9%, and 66.9%, respectively.[419] The court found that the company's poor performance was the result of unexpected new market entrants, which lead to price erosion.[420] The court held that this "*sudden and sustained drop* in Akorn's business performance" was reasonably expected to constitute a material adverse effect.[421]

The *Akorn* court also addressed whether the seller's regulatory issues, which were not disclosed to the buyer when the merger agreement was signed, constituted a material adverse effect.[422] After weighing the credibility of the experts and conducting its own cross-check, the court concluded that the regulatory issues represented a 21% decrease in

---

[416] *Akorn*, 2018 WL 4719347, at *55.

[417] *Id.* at *2.

[418] *See id.* at *55 & nn.577–78.

[419] *Id.* at *56. Analyst estimates for Akorn's peers were only projected to decline those years by 11%, 15.3%, and 15%, respectively. *Id.*

[420] *Id.* at *55.

[421] *Id.* at *47, *57, *74 (emphasis added); *see also id.* at *60 ("The problem is what happened to the business that [the buyer] agreed to buy.").

[422] *Id.* at *2, *71–76.

the equity value of the seller.[423]  The court held that this decrease was reasonably expected to constitute a material adverse effect.[424]

Comparing DecoPac's performance against that of the sellers in *IBP* and *Akorn* confirms that DecoPac was not reasonably likely to experience a material adverse effect. As in *IBP*, DecoPac experienced a precipitous drop but then rebounded in the two weeks immediately prior to termination and was projected to continue recovering through the following year.[425]  And unlike in *Akorn*, DecoPac was not projected to face a "sustained drop" in business performance.[426]

---

[423] *Id.* at *72–74.

[424] *Id.* at *76.

[425] Whereas IBP's earnings declined 64% year-over-year during the quarter preceding termination, *IBP*, 789 A.2d at 22, 50–51, DecoPac's EBITDA decreased only 16% year-over-year during the quarter immediately prior to termination.  *See* JX-182 at 4; JX-1933 at 4.  Whereas IBP's earnings in the year following termination were projected to be approximately 31% lower than they were the year prior to the signing of the merger agreement, *IBP*, 789 A.2d at 66, 70–71, the Downside #1 Case projected DecoPac's adjusted EBITDA to be 5% *higher* in 2021 than in 2019.  *See* JX-1064 at cells T46, AD46.

[426] In *Akorn*, analyst projections for the seller's EBITDA in the year of termination and subsequent two years were 62.6%, 63.9%, and 66.9% lower than they were at the time of signing.  *Akorn*, 2018 WL 4719347, at *55.  Comparing the Downside #1 Case to Kohlberg's projections contained in its original investment memorandum, DecoPac's adjusted EBITDA projections for 2020, 2021, and 2022 were 27%, 9%, and 8% lower, respectively, than they were at the time of signing.  *Compare* JX-998 at cells Y46, AD46, AI46, *with* JX-694 at 37.

*Hexion* does not require a different outcome, although the seller there experienced a less significant initial decline in sales than DecoPac.  In *Hexion*, after the parties signed the merger agreement, the seller's second-half 2007 EBITDA suffered a 22% year-over-year decrease, and its first-half 2008 EBITDA suffered a 19.9% year-over-year decrease. 965 A.2d at 740.  Management believed that the decrease was caused by various macroeconomic trends, such as a sharp increase in the prices of crude oil and natural gas and unfavorable foreign exchange rates.  *Id.* at 743.  In answering the question of whether

Kohlberg has therefore failed to carry its burden of proving that an event had or was reasonably expected to have an effect sufficiently material and adverse to qualify as an MAE. Because Kohlberg failed to demonstrate an MAE, the analysis could end here. For completeness, this decision addresses the remaining elements of the contractual analysis.

###### b. Is the exception for effects arising from or related to changes in laws or orders by government entities applicable?

The MAE exception covers effects "arising from or related to . . . changes in any Laws, rules, regulations, orders, enforcement policies or other binding directives issued by any Governmental Entity."[427]

---

a material adverse effect occurred, the court focused on future projections, stressing that 2008 EBITDA was projected to be only 7–11% lower than 2007 EBITDA and that 2009 projected EBITDA would be "essentially flat" as compared to 2007. *Id.* at 742–43. The court also noted that management had begun to recognize a "recent reversal" in the macroeconomic trends that harmed the seller's business in the second half of 2007 and first half of 2008. *Id.* at 743. Based on those considerations, the court held that the seller did not suffer a material adverse effect. *Id.*

Here, under the Downside #1 Case, DecoPac was projected to face a deeper initial slump than the seller in *Hexion*, but it was also projected to experience a swifter and more pronounced rebound. The Downside #1 Case projected, relative to 2019: a 49% decrease in first-half 2020 adjusted EBITDA; an 8% increase in second-half 2020 adjusted EBITDA; a 5% increase in 2021 adjusted EBITDA; and a 15% increase in 2022 adjusted EBITDA. JX-998 at row 46. As in *Hexion*, the rebound and the predicted "reversal" of macroeconomic trends negatively impacting DecoPac indicate that it was not reasonable to expect that DecoPac would suffer a material adverse effect. *See Hexion*, 965 A.2d at 743.

[427] SPA § 1.1.

The language "arising from or related to" is broad in scope under Delaware law.[428] A particular effect is excluded if it relates to an excluded cause, even if it also relates to non-excluded causes; any other interpretation impermissibly "reads the broad term 'related to' out of the contract."[429] Thus, revenue declines arising from or related to changes in law fall outside of the definition of an MAE, regardless of whether COVID-19 prompted those changes in the law.[430]

To establish the relation to the exception, Plaintiffs rely on the expert report and testimony of Professor Steven Davis. Davis ran a regression analysis of county-level DecoPac sales at a weekly frequency, which included controls for recurring fluctuations and local conditions that affect those sales.[431] He considered the impact of school closures, shelter-in-place orders, non-essential business closure orders, and restaurant closure orders.[432] The analysis established that the vast majority of the decline in DecoPac sales arose from, or at the very least related to, those government orders, and it showed that sales first fell at the precise moment that such orders were first issued.[433]

---

[428] *Lillis v. AT&T Corp.*, 904 A.2d 325, 331 (Del. Ch. 2006) ("[U]nder Delaware law, the phrases . . . 'relating to,' and 'arising out of,' . . . are paradigmatically broad terms.").

[429] *See Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1150 (Del. Ch. 2006).

[430] *See AB Stable*, 2020 WL 7024929, at *55–56, *65 (holding that an MAE definition "does not require a determination of the root cause of the effect" in order for a carveout to apply and that that the COVID-19 pandemic fell "within an exception to the MAE Definition for effects resulting from 'calamities'").

[431] JX-1776 ¶¶ 25–27.

[432] *Id.* ¶¶ 22–24.

[433] *See id.* ¶ 24 ("These government orders jointly explain 88.4 percent of the shortfall in DecoPac sales in the period from 8 March to 30 May 2020 relative to the same period in

Plaintiffs therefore showed that the effects fell within one of the SPA's enumerated carveouts.

### c. Does the exclusion for materially disproportionate effects relative to other comparable entities apply?

The MAE exception excludes events "to the extent that such matter has a materially disproportionate effect on the Group Companies, taken as a whole, relative to other comparable entities operating in the industry in which the Group Companies operate."[434]

To establish a group of comparable companies for this analysis, DecoPac again relies on the testimony of its grocery expert, Welsh. He defines DecoPac's industry as "the supermarket industry" in general.[435] Kohlberg argues that, because the supermarket industry in general thrived during the pandemic, DecoPac was disproportionately affected.

Kohlberg's definition of DecoPac's industry, however, is overbroad and directly contradicted by the record. For example, Kohlberg's internal deal documents,[436]

---

2019."); *id.* ¶ 77 ("Whether the effects are direct or indirect, however, the total effects on DecoPac sales that I estimate can be described collectively as changes in DecoPac sales that arise from or relate to government orders."); *see also* Trial Tr. at 1093:21–1095:18 (Davis) ("[A]bout 88 percent of the shortfall, of that 35 percent shortfall in DecoPac sales, was caused by the combined effect of the four kinds of government orders that I've captured in my regression analysis.").

[434] SPA § 1.1.

[435] Trial Tr. at 1517:11–14 (Welsh). In its brief, Kohlberg described DecoPac's industry as "suppliers of ingredients and products to grocery stores and bakeries." Dkt. 291, Defs.-Countercl. Pls.' Post Trial Reply Br. ("Defs.' Post-Trial Reply Br.") at 44. The court sees no material distinction between this definition and Welsh's definition.

[436] JX-396 at 6 (describing DecoPac as "market[ing] and suppl[ying] a variety of cake-decorating products for bakeries, professional cake decorators and cake-decorating enthusiasts" and stating that DecoPac "is a leading distributor of decoration accessory products for the In-Store Bakery ('ISB') channel"); JX-650 at 4 (same).

DecoPac's own description,[437] and trial testimony from both parties' witnesses[438] suggest a narrower industry definition. Kohlberg's sworn interrogatory response also describes DecoPac's industry as "suppliers of ingredients and products used by grocery stores and bakeries to create high-end decorated cakes for celebratory events," which is far narrower than Welsh's definition.[439] Because Welsh's description of DecoPac's industry is overbroad, his conclusions are unpersuasive.

Plaintiffs' expert, Austin Smith, presented a narrower and more realistic description of DecoPac's industry: "[S]uppliers of products used by in-store bakeries and other cake retailers to decorate cakes and cupcakes for celebratory events and other occasions."[440] This description more closely comports with the evidence and trial testimony of both parties than Welsh's does. Austin Smith further established that DecoPac's sales closely tracked two different proxies for the performance of comparable entities—IDDBA sales data for in-store bakeries and Nielsen data on decorated cake sales.[441] She determined that it was necessary to use broader industry proxies, as opposed to comparable companies,

---

[437] JX-1421 at 10 (describing the "Nature of [DecoPac's] Business" as "distribut[ing] cake decorating products").

[438] *See, e.g.*, Trial Tr. at 431:18–23 (Hollander) ("I would describe DecoPac as a distributor of cake decorating accessories."); *id.* at 161:4–12 (Anderson) ("Q. And what industry do you understand, as you've been performing your functions at DecoPac, DecoPac to be in? A. We sell cake decorations and supplies for cakes and cupcakes.").

[439] *See* JX-1554 at 55.

[440] JX-1777 ¶ 7(d).

[441] *See* Trial Tr. at 1030:24–1036:9 (Austin Smith); JX-1777 ¶¶ 7(d), 64–102; JX-1804 ¶¶ 3(e)–(g), 56–68.

because most of DecoPac's competitors are privately held and therefore their financials are not publicly available.[442]

Using these proxies, Austin Smith found that, at the time of termination, DecoPac's total year-over-year weekly revenue had decreased by approximately 15% and regular sales by approximately 53%, whereas IDDBA sales data for those same weeks showed approximately a 32% decrease for in-store bakeries and 42% for cakes.[443] The Nielsen data, which Welsh also utilized, showed an approximate 39% decrease for decorated cakes during that period.[444] As Austin Smith correctly concludes in her reports, these data sets do not show that DecoPac faced a disproportionate impact relative to its industry peers.[445]

Kohlberg therefore did not show that DecoPac experienced a disproportionate effect relative to comparable entities operating in the same industry. Kohlberg thus fails at every step of the three-part MAE analysis.

### 2. Top-Customers Representation

Kohlberg also argues that Plaintiffs breached the Bring-Down Condition due to inaccuracies in the Top-Customers Representation.[446] Under the SPA, the Top-Customers Representation only excuses Kohlberg from closing if it is untrue to such a degree that it

---

[442] JX-1777 ¶¶ 7(d), 68–73.

[443] *Id.* ¶ 85 Fig. 10.

[444] JX-1804 ¶ 28 Fig. 1.

[445] *See* JX-1777 ¶ 7(e); JX-1804 ¶ 3(f)–(g).

[446] *See* SPA §§ 3.21(a), 7.1(a).

had or would reasonably be expected to have material adverse effect.[447]  For this reason, the Top-Customers Representation analysis is largely subsumed within the MAE Representation analysis.  This decision nevertheless briefly addresses the parties' unique arguments raised in connection with this issue.

Kohlberg argues that by the end of April 2020, an MAE was reasonably expected. Kohlberg contends that by the end of April 2020, year-to-date sales to each of these customers were down compared to the same period of 2019, between 8.1% and 30.8%, with sales to HEB realizing the largest decrease (30.8%).[448]  In terms of gross profit, year-to-date changes ranged from a 27.9% decrease to a 0.7% increase, with HEB again realizing the largest decline (27.9%).[449]  Overall, DecoPac's top ten customers represented approximately 50% of the Company's revenue in 2019.[450]

The same fatal defects affecting Kohlberg's general MAE Representation argument pervade this more specific one.  Based on the limited forward-looking projections for Kohlberg's top customers in the record, it appears that sales to top customers would see a near-full rebound by 2021.[451]  Kohlberg provides no additional evidence that would suggest that the decrease in sales to top customers was reasonably expected to be durationally significant and material to a reasonable acquirer.  Instead, Kohlberg relies on

---

[447] *See* Defs.' Post-Trial Opening Br. at 95 (citing SPA § 7.1(a)); Defs.' Post-Trial Reply Br. at 45.

[448] JX-1232 at 36, 42.

[449] *Id.*

[450] Trial Tr. at 245:18–247:7 (Anderson).

[451] *See* JX-2438 at 8.

Welsh's thesis that broader industry changes were bound to doom DecoPac. As the court held above, this theory is unpersuasive and therefore insufficient to support a finding that Kohlberg reasonably expected an MAE.

Plaintiffs therefore did not breach the Bring-Down Condition due to inaccuracies in the Top-Customers Representation.

### 3. Ordinary Course Covenant

Kohlberg argues that Plaintiffs breached the Ordinary Course Covenant in two material respects: by drawing down $15 million on its $25 million revolver and by implementing cost-cutting measures inconsistent with past DecoPac practice.[452]

The Ordinary Course Covenant provides that, "except . . . as consented to in writing by [Kohlberg]," Plaintiffs must operate DecoPac "in a manner consistent with the past custom and practice of the Group Companies (including with respect to quantity and frequency)."[453] Unlike the Bring-Down Condition, where the degree of non-compliance had to be sufficient to constitute an MAE, the Covenant Compliance Condition requires compliance with the Ordinary Course Covenant "in all material respects."[454] Kohlberg bears the burden of proving that DecoPac did not comply with the Ordinary Course Covenant in all material respects.[455]

---

[452] *See* SPA § 7.1(b).

[453] *Id.* §§ 1.1, 6.1.

[454] *Id.* § 7.1(b).

[455] *See AB Stable*, 2020 WL 7024929, at *51 ("Buyer contends that Seller failed to fulfill the Ordinary Course Covenant. Consistent with prior precedent, Buyer bore the burden of

Generally, ordinary course covenants exist to "help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing."[456] One way that they serve this purpose is by mitigating the incentive for the seller to act opportunistically between signing and closing, an incentive sometimes referred to as the "moral hazard problem."[457]

This court has interpreted "the contractual term ordinary course to mean the normal and ordinary routine of conducting business."[458] "Generally speaking, there are two principal sources of evidence that the court can examine to establish what constitutes the ordinary course of business."[459] The court can look to (i) how similar companies have operated or (ii) how the specific seller company has operated.[460] In each category, the court may look to how the benchmark operated "both generally and under similar

---

proving that Seller breached this covenant and caused the Covenant Compliance Condition to fail.").

[456] *Akorn*, 2018 WL 4719347, at *83 (cleaned up); *see also* Kling & Nugent, *supra* note 370 § 13.03, at 13-19–20 ("The parties' motivations are clear: the Buyer wants to make sure the business it is paying for at closing is essentially the same as the one it decided to buy at signing (which presumably has been represented at signing to be the same as the one the Buyer reviewed during the due diligence process) and the Seller wants to operate as free of constraints as possible. The Authors believe that the Seller's concerns here when taken in the context of a business it has agreed to sell generally are just not as important as the Buyer's. Thus, the equities of the situation generally weigh in on the side of the Buyer.").

[457] *Akorn*, 2018 WL 4719347, at *83 n.775, *88.

[458] *See AB Stable*, 2020 WL 7024929, at *68 (cleaned up); *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014) (quoting *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009)).

[459] *AB Stable*, 2020 WL 7024929, at *70.

[460] *Id.*

circumstances."[461]   Where an ordinary course provision includes the phrase "consistent with past practice" or a similar phrase, however, the court evaluates the second category only.[462]

The *AB Stable* decision provides context for the meaning of the phrase "in all material respects."   There, the seller owned fifteen limited liability companies, each of which owned a luxury hotel.[463]   Post-signing, the seller closed two of the hotels and severely limited the operations of the other thirteen, citing both very low demand and government orders as the basis.[464]   The seller also slashed employee headcount, reduced employee hours, and minimized spending on marketing and capital expenditures, among other changes.[465]   The court ultimately found that the seller breached its obligations under the ordinary course covenant because the seller made extensive changes to its business due to the COVID-19 pandemic.[466]

In reaching this conclusion, the court explained that the "in all material respects" standard "does not require a showing equivalent to a Material Adverse Effect, nor a showing equivalent to the common law doctrine of material breach."[467]   Rather, it seeks to

---

[461] *Id.*

[462] *See id.* at *71.

[463] *See id.* at *11.

[464] *Id.* at *75.

[465] *Id.* at *75–77.

[466] *Id.* at *77–78.

[467] *Id.* at *73.

"exclude small, *de minimis*, and nitpicky issues that should not derail an acquisition."[468] Under this standard, "[t]o qualify as a breach, the deviation must significantly alter the total mix of information available to the buyer when viewed in the context of the parties' contract."[469] Put differently, the materiality standard at issue asks whether the business deviation significantly alters the buyer's belief as to the business attributes of the company it is purchasing.

Kohlberg's first argument based on the revolver draw fails under this standard. Kohlberg argues that the size of and reason for the $15 million revolver draw on March 26 render it inconsistent with past practices and therefore material. It is true that the $15 million draw was DecoPac's largest revolver draw since Snow Phipps acquired the company in 2017[470] and that DecoPac began considering the revolver draw around the same time at which it prepared a liquidity forecast.[471]

The record reflects, however, that DecoPac had drawn on this facility five time since late 2017.[472] At trial, Mantel credibly testified that the draw was driven solely by a Snow Phipps policy implemented broadly among its portfolio companies to address counterparty

---

[468] *Id.* (quoting *Akorn*, 2018 WL 4719347, at *85); *cf. Cooper Tire*, 2014 WL 5654305, at *17 (finding a breach of an ordinary course covenant where the seller's actions "evince[d] a conscious effort to *disrupt* the operations of the facility").

[469] *AB Stable*, 2020 WL 7024929, at *73.

[470] *See* JX-985; Trial Tr. at 281:22–282:6 (Anderson).

[471] *See* JX-909; JX-932 at 4; JX-986 at 5; Trial Tr. at 403:14–404:7 (Twedell).

[472] JX-1612 (reflecting draws on 9/29/17, 12/21/17, 12/27/17, 4/23/18, and 5/28/18, in the respective amounts of $5 million, $1 million, $2 million, $750 thousand, and $5 million).

risks and was not in response to liquidity issues at DecoPac.[473] Moreover, DecoPac disclosed the draw request to Kohlberg within one day of making it, offered to repay it within two days of Kohlberg raising issue with it, and never used any of the funds.[474] This evidence establishes that the revolver draw was not inconsistent with past practices and did not reflect a material departure from the ordinary course of business. The partial revolver draw that DecoPac held dormant in its bank account, immediately disclosed, and offered to repay within days of Kohlberg's notice does not "significantly alter the total mix of information available to the buyer when viewed in the context of the parties' contract."[475]

Kohlberg's challenge to the revolver draw fails for the additional reason that the supposed breach could be cured easily. Section 8.1(d) requires notice of breach and an opportunity to cure.[476] Delaware law requires compliance with notice and cure

---

[473] Trial Tr. at 47:10–49:3 (Mantel). Anderson indicated, however, that he and Twedell ultimately determined the exact size of the revolver draw. *See id.* at 231:12–24 (Anderson) ("Q. Did you arrive at – how much was drawn down on the revolver? A. We ended up drawing down 15 million. Q. And how is it that you arrived at that number? A. [Twedell] and I had conversation [sic]. . . . [Mantel] had kind of indicated 10 million. And I went back to [Twedell] and I said, 'What do you think?' And he said, 'Let's do 15. John, it's not a big deal, and, you know, we can do 15.' So him and I kind of came to the conclusion that 15 made the most sense.").

[474] JX-1027; JX-1153 at 2; JX-1406 at 2; Trial Tr. at 1334:17–23 (Forrey); *id.* at 60:11–62:4 (Mantel); *id.* at 232:1–12 (Anderson).

[475] *See AB Stable*, 2020 WL 7024929, at *73.

[476] SPA § 8.1(d).

provisions[477] unless compliance would be futile.[478] Kohlberg never provided notice that the revolver draw constituted a breach of the Ordinary Course Covenant. Plaintiffs' witnesses testified that the revolver could have been easily and immediately repaid.[479] This testimony is corroborated by the fact that DecoPac never used the funds and paid them back by August 2020.[480] Having failed to honor the notice and cure provision as to the revolver draw, Kohlberg lacked the authority to terminate on April 20 on that basis.

Kohlberg's second argument based on cost-cutting measures is likewise unavailing. Kohlberg claims that DecoPac breached the Ordinary Course Covenant by implementing "severe cost-cutting measures and radical shifts in the ways in which it dealt with customers and suppliers."[481] Kohlberg argues that DecoPac minimized marketing, capital

---

[477] *See, e.g.*, *Feeley v. NHAOCG, LLC*, 2012 WL 4859132, at *8 (Del. Ch. Oct. 12, 2012) (holding that a party "lacked authority" to terminate a contract because it never sent a required notice that would trigger a cure period); *Velocity Express, Inc. v. Off. Depot, Inc.*, 2009 WL 406807, at *1 (Del. Super. Feb. 4, 2009) (ruling that a termination notice that "failed to give the appropriate 30-day opportunity to cure" was ineffective); *see also AB Stable*, 2020 WL 7024929, at *82 ("Compliance with a notice requirement is not an empty formality.").

[478] *See Preferred Invs., Inc. v. T & H Bail Bonds*, 2013 WL 6123176, at *6 (Del. Ch. Nov. 21, 2013) (holding that a failure to adhere to the formal requirements of a cure provision does not mitigate a finding of breach of the agreement where "any attempt to satisfy [the cure] requirement more formally would have been futile"); *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at *13 (Del. Super. Dec. 7, 2012) ("The contractual obligation to provide pre-suit notice and opportunity to cure may be excused where such notice would be futile in achieving its intended purpose" (citing *Rsrvs. Dev., LLC v. R.T. Props., LLC*, 2011 WL 4639817, at *7 (Del. Super. Sept. 22, 2011))).

[479] *See* Trial Tr. at 232:9–12 (Anderson) (agreeing that the revolver could "have been paid back right away"); *id.* at 335:23–337:2 (Twedell) (testifying that DecoPac's decision to draw down on its revolver was not influenced by cash-flow needs).

[480] *See* JX-1612; Trial Tr. at 337:3–8 (Twedell).

[481] Defs.' Post-Trial Opening Br. at 99.

expenditures, and labor costs;[482] halted spending "on all outside consultants";[483] and instructed its vendors to halt or delay production and shipments.[484]

Plaintiffs proved at trial that decreasing labor costs in line with decreased production was in fact a historical practice of DecoPac.[485] As to the other cost-cutting measures, Plaintiffs contend that management told Kohlberg before termination that DecoPac would reduce costs in tandem with the sales decline, "[a]s has been our practice for years."[486] Since then, it has done just that, operating as usual, as DecoPac's witnesses testified.[487] Spending varied only in expected and *de minimis* ways from prior years with higher sales.[488] Kohlberg bore the burden of proof but neglected to meaningfully engage in these points, and Kohlberg's argument thus fails.

Kohlberg's cost-cutting argument fails for the additional reason that Kohlberg waived the argument by failing to assert it timely in litigation. Kohlberg did not raise cost-cutting measures as a basis for termination in its answer, counterclaims, or interrogatory responses.[489] It did not identify this issue as a basis for termination in the termination

---

[482] JX-1331 at 2.

[483] JX-982; Trial Tr. at 276:8–11 (Anderson).

[484] JX-1022 at 1–2; Trial Tr. at 276:24–277:5 (Anderson). *But see* JX-1022 (Twedell stating: "I did have a conversation with [Anderson] and understand that we will not be contacting our customers and asking them things that may cause them to re-think their planned orders.").

[485] JX-1063 at 3.

[486] *Id.* at 1, 3.

[487] *See, e.g.*, Trial Tr. at 232:13–19 (Anderson); *id.* at 378:9–15 (Twedell).

[488] JX-2438 at 1.

[489] *See* Defs.' Answer; Countercl. Pls.' Countercls.; JX-1554 at 44–45.

letter.[490]  It did not raise this issue in briefing its motion to dismiss.[491]  It was not until its

December 2020 pre-trial brief, submitted after the *AB Stable* decision found that (more

extreme) cost-cutting measures constituted a breach of the ordinary course covenant, that

Kohlberg asserted this argument.[492]  Kohlberg prejudiced Plaintiffs by failing to surface its

cost-cutting argument until pre-trial briefing, and the argument is thus deemed waived.

Accordingly, Kohlberg has not carried its burden of proving that Plaintiffs breached

their obligations under the Ordinary Course Covenant.

## B.     Breach of Financing Obligations

Plaintiffs claim that Kohlberg breached its obligations under the SPA by failing to

use its reasonable best efforts to obtain the committed Debt Financing and then failing to

obtain alternative financing.

### 1.     Committed Debt Financing

Relying on Sections 6.15(a) and 6.15(b), Plaintiffs claim that Kohlberg breached

the SPA by failing to use reasonable best efforts to enter into definitive agreements with

respect to the Debt Financing on terms and conditions no less favorable to Kohlberg than

the DCL.

Section 6.15(a) obligated Kohlberg to

> use its reasonable best efforts to arrange and obtain the Debt
> Financing on terms and conditions acceptable to the Buyer,
> including commercially reasonable efforts to (i) maintain in

---

[490] *See* JX-1396.

[491] *See* Defs.' Mot. to Dismiss Opening Br.; Dkt. 133, Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pls.' Verified Am. Compl.

[492] *See* Dkt. 255, Defs.-Countercl Pls.' Pre-Trial Br. ("Defs.' Pre-Trial Br.") at 49–50.

effect the Debt Financing and the [DCL], (ii) satisfy all conditions applicable to the Buyer obtaining the Debt Financing, including the payment of any commitment, engagement, or placement fee required to be paid as a condition to the Debt Financing, (iii) enter into definitive agreements with respect to the Debt Financing that are on terms and conditions no less favorable to Buyer than those contained in the [DCL], so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date, (iv) consummate the Debt Financing at or prior to the date that the Closing is required . . . and (v) comply with its obligations under the [DCL].[493]

Efforts clauses like Section 6.15(a) generally recognize that a party's ability to perform some contractual obligations (e.g., obtaining Debt Financing) may depend on the actions of third parties (e.g., the Lenders). Efforts clauses generally replace "the rule of strict liability for contractual non-performance that otherwise governs"[494] with "obligations to take all reasonable steps to solve problems and consummate the" obligation.[495] When assessing whether a party has breached an efforts clause in a transaction agreement, "this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty."[496] This

---

[493] SPA § 6.15(a).

[494] *Akorn*, 2018 WL 4719347, at *86 (holding that "reasonable best efforts" and "commercially reasonable efforts" obligations recognize that "a party's ability to perform its obligations depends on others or may be hindered by events beyond the party's control").

[495] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017) (citing *Hexion*, 965 A.2d at 755–56).

[496] *See Akorn*, 2018 WL 4719347, at *91–92.

standard applies with equal force to "reasonable best efforts" and "commercially reasonable efforts" language.[497]

Section 6.15(b) prohibited Kohlberg from consenting to "any amendment or modification" of the DCL "[w]ithout the prior written consent of Sellers."[498] Section 6.15(b) went on to list a series of exceptions to the general prohibition, providing that Kohlberg may alter the DCL if doing so does not

> (v) reduce the aggregate amount of the Debt Financing below an amount sufficient (together with the Equity Financing and cash on hand or other sources of immediately available funds) for Buyer to pay and satisfy in full Buyer's payment obligations pursuant to Article II at Closing, and to pay all related fees and expenses of Buyer,
>
> (w) impose new or additional conditions precedent or modify any existing conditions precedent set forth therein in a manner adverse to the interests of the Company,
>
> (x) materially delay the timing of the funding of the commitments thereunder or
>
> (y) materially adversely impact the ability of the Buyer to enforce its rights under the Debt Commitment Letter or to consummate the transactions contemplated by this Agreement or make funding of the commitments thereunder less likely to occur.[499]

Read together, Section 6.15(a) and Section 6.15(b) require Kohlberg to use its reasonable best efforts to execute Debt Financing on the terms of the DCL or on better

---

[497] *See AB Stable*, 2020 WL 7024929, at *91–92 (citing *Williams*, 159 A.3d at 271–73; *Hexion*, 965 A.2d at 749).

[498] SPA § 6.15(b).

[499] *Id.* (formatting altered).

terms and prohibit Kohlberg from modifying the terms of the DCL if doing so would jeopardize Debt Financing or the Closing. The provisions thus protect Kohlberg by making the terms of the DCL a floor and protect Plaintiffs by requiring Kohlberg to maintain that floor.

Plaintiffs claim that Kohlberg breached this obligation by demanding more favorable terms and refusing to close on the DCL when the Lenders refused the Financing Demands. Plaintiffs proved at trial that, even as the debt markets tightened, each of the Lenders remained willing to lend on the terms of the DCL.[500] Plaintiffs also proved that, rather than take any effort to finalize a credit agreement based on the terms of the DCL, Kohlberg made the Financing Demands and then refused to close when the Lenders rejected those demands.[501] Plaintiffs contend that the Financing Demands were more favorable to Kohlberg, such that Kohlberg could not refuse to proceed if the demands were rejected.

Kohlberg parses the analysis more finely, advancing a set of intertwined theories that can be reduced in essence to the following two arguments.

---

[500] *See supra* note 277 and accompanying text; *see also* Trial Tr. at 64:19–65:7 (Mantel) ("Q. Now, Mr. Mantel, after you learned from Mr. Hollander that Kohlberg did not intend to close the transaction, did you yourself make any inquiry of the lenders to ascertain their intent? A. I did, yes. Q. What did you do? A. I spoke to them and also sent them emails to assess their intent regarding the DCL. Q. . . . [W]hat was the response that you got from all the lenders? A. All the lenders said that they were prepared to meet their commitments.").

[501] *See* JX-1242; JX-1267; JX-1396; Trial Tr. at 50:23–57:13 (Mantel).

First, Kohlberg contends that the DCL *entitled* Kohlberg to the Financing Demands as terms of Debt Financing, such that Kohlberg could not have breached its obligations under Section 6.15 by demanding them (the "entitlement argument").

Alternatively, Kohlberg argues that the DCL left certain terms open to be negotiated post-signing, that the Financing Demands spoke to open terms, and that it complied with its obligations when negotiating the open terms (the "open-terms argument"). The alternative argument requires the court to first revisit the meaning of the phrase "acceptable to the Buyer" in relevant contractual language (the "acceptable-to-buyer argument") before addressing Kohlberg's argument that it had reasonable grounds for making the Financing Demands and thus complied with its efforts obligations when negotiating the DCL (the "reasonable-grounds argument").

### a. The Entitlement Argument

Kohlberg contends that it was *entitled* to make the Financing Demands. Kohlberg reasons that if the DCL establishes a floor that protects Kohlberg, then Kohlberg could not have breached its contractual obligations to Plaintiffs by demanding terms that it was entitled to receive. Kohlberg does not advance its entitlement argument as to the Revolver Demand or the Holiday Demand, thus limiting the argument's force.

Kohlberg bases its claim of entitlement to the Addback Demands on two clauses in the DCL's definition of "Consolidated EBITDA." The first, "Clause (a)," permitted EBITDA addbacks for "extraordinary, unusual or non-recurring losses, gains or expenses

and transaction expenses" of up to $15 million.[502]  The second, "Clause (o)," permitted "other adjustments, exclusions and add-backs as shall be mutually agreed or as otherwise consistent with the First Lien Documentation Principles."[503]

Kohlberg did not rely on these clauses at the outset of this litigation and instead took the inconsistent position that the credit agreement could only contain terms to which the Lenders "mutually agreed."  For example, when opposing Plaintiffs' motion to expedite, in its answer and counterclaims, in its motion to dismiss, and in its interrogatory responses, Kohlberg described Clause (o) as a "catch-all" that Kohlberg and the Lenders must "mutually agree[] upon."[504]  During his deposition, Kohlberg's financing expert testified that Kohlberg cannot insist on addbacks under Clause (o) to which the Lenders did not agree, a point that Foster was forced to concede through impeachment at trial.[505]

Kohlberg advanced the starkest articulation of this argument, which spoke to Clause (a) as well as Clause (o), during the April 17, 2020 hearing on Plaintiffs' initial motion to expedite, when defense counsel stated:

> [A]s is always the case with these types of financing
> commitment letters, EBITDA can mean different things to

---

[502] DCL Ex. B, at B-38.  Clause (a) provides for a cap of $15 million *or* 30% of Consolidated EBITDA, *see* DCL Ex. B, at B-38, but Kohlberg only refers to the $15 million cap, presumably because, under the March 26 Model, 30% of Consolidated EBITDA would be less than $15 million through 2022.  *See* JX-1064 at row 26.

[503] DCL Ex. B, at B-40.

[504] *See* Dkt. 18, Defs.' Opp'n to Pls.' Mot. for Expedited Proceedings at 6; Countercl. Pls.' Countercls. ¶ 35; Defs.' Mot. to Dismiss Opening Br. at 9; JX-1530 at 16.

[505] *See* Trial Tr. 1598:8–1599:3 (Foster); *see also id.* at 1187:1–1189:20 (Bedrosian) (testifying that any changes between the DCL and the final agreement under Clause (o) "need[] to be discussed and to be mutually agreed" upon).

different people. And therefore, the definition of "EBITDA" . . . in important respects, is left open for the purposes of testing compliance. And that is an item that is to be negotiated between the lenders and the borrower. . . .

[The lenders] agreed to the general categories of add-backs and adjustments to exclusions. But they left open, for purposes of testing compliance . . . whether or not there could be certain new add-backs or adjustments and what the scope and nature of the list of add-backs would be. . . .

[F]or instance, [Clause A] is an add-back for "extraordinary, unusual, or non-recurring losses." Another add-back -- and this is [Clause] (o) -- [is] for "other adjustments, exclusions and add-backs as shall be mutually agreed or as otherwise consistent with the First Lien Documentation Principles." . . . So . . . add-backs were potentially going to be a point of negotiation when it came time to do definitive documentation.

And, . . . in March, . . . [w]e approached the lenders, as we're entitled to do. I mean, [Clause] (o) clearly says "mutually agreed upon." So we were allowed to ask for add-backs. *And the lenders, as is their right, said no*.[506]

At the time Kohlberg made this argument, the DCL and SPA were indisputably still in effect and could be enforced. Thus, it behooved Kohlberg to take the position that the Lenders could reject Kohlberg's demands by declining to agree. By tacitly denying that they were *entitled* to the Addback Demands (and that the Lenders were correspondingly *obligated* to provide them), Kohlberg avoided any claim that might have compelled them to obtain the addbacks and close the deal.

---

[506] JX-1387 at 26–28 (emphasis added).

It was not until pre-trial briefing that Kohlberg pivoted to present its entitlement argument.[507] Even then, Kohlberg stopped short of arguing that the DCL entitled Kohlberg to the precise Addback Demands made by Kohlberg.[508]

The doctrine of waiver likely supplies an adequate basis to hold Kohlberg to its previous representation that the Lenders could say no to the Addback Demands. Generally speaking, "[w]hen an argument is first raised in a pretrial brief after the parties already have shaped their trial plans, it is simply too late and deemed waived."[509] In this case, because Kohlberg did not clearly articulate its entitlement theory until pre-trial briefing, long after the parties could have shaped discovery and their trial plans, Kohlberg waived the argument.

In the interest of completeness, this decision considers Kohlberg's entitlement argument on its merits, turning first to the question of whether Clause (a) entitled Kohlberg to the Addback Demands. It does not. Language like Clause (a) is generally not intended

---

[507] *See* Defs.' Pre-Trial Br. at 3 ("Among other addback categories, the DCL expressly allowed . . . uncapped addbacks consistent with certain guiding principles, including to reflect the operational and strategic requirements of KCAKE and DecoPac." (internal quotation marks omitted)). In response to Plaintiffs' waiver argument, Kohlberg states in its post-trial reply brief that it "argued throughout this litigation its entitlement to addbacks consistent with the First Lien Documentation Principles" and cites to its Counterclaims, interrogatory responses, expert reports, and depositions. Defs.' Post-Trial Reply Br. at 20–21. The majority of the documents cited by Kohlberg do not articulate the argument that the DCL entitled Kohlberg to the Addback Demands. *See* JX-1530; JX-1554; JX-1797; Bedrosian Dep. Tr.; Foster Dep. Tr. Only one of the documents, which was dated September 20, 2020, even suggested that Kohlberg was entitled to the addbacks. *See* JX-1633 at 20.

[508] *See* Defs.' Pre-Trial Br. at 3, 34–36, 39–44.

[509] *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012).

to supply addbacks like those demanded by Kohlberg.  As Plaintiffs' financing expert testified, similar clauses are understood in the industry to capture nonrecurring events that are easy to quantify—not lost revenue.[510]  The Lenders testified to the same effect.[511]

Even if Clause (a) covered COVID-19-related revenue losses, it does not follow that Kohlberg was entitled to demand a $35 million addback, let alone an uncapped addback. Rather, Clause (a) capped Kohlberg's entitlement to $15 million in EBITDA addbacks. The fact that Kohlberg demanded more than $15 million in EBITDA addbacks suggests that Kohlberg did not intend this addback to fall entirely within the scope of Clause (a).

Nor does Clause (o) independently entitle Kohlberg to the Addback Demands. Again, Clause (o) provides that addbacks shall be "mutually agreed" upon or "otherwise consistent with the First Lien Documentation Principles."[512]  Because the addbacks were not "mutually agreed," Kohlberg argues that it was entitled to the Addback Demands under the First Lien Documentation Principles (the "Principles").

The Principles, however, are merely amorphous guidelines and do not supply a clear source of entitlement.  The Principles generally state that the terms of the final credit

---

[510] Trial Tr. at 1150:6–1153:20 (Bedrosian); *see also The Impact of COVID-19 on Adjusted EBITDA*, Proskauer (May 4, 2020), https://www.proskauer.com/alert/the-impact-of-covid-19-on-adjusted-ebitda ("[B]orrowers may attempt to classify lost revenue as a loss for purposes of the (i) extraordinary, non-recurring or unusual or (ii) discontinued operations addbacks. This should not be permitted.").

[511] *See* Trial Tr. at 794:23–795:5 (Antares); *id.* at 824:23–825:2 (Owl Rock); *id.* at 969:14–19 (Ares); Churchill Dep. Tr. at 104:14–24.

[512] DCL Ex. B, at B-40.

agreement would be no less favorable than a precedent agreement.[513] They do not contain mandatory language saying that the parties "shall" or "must" enter into any terms. To the contrary, they provide that the final credit agreement shall "reflect the operational and strategic requirements" of DecoPac and "be negotiated in good faith."[514] The requirement that terms be negotiated in good faith contradicts the argument that the Principles supply a vested right to any specific term. Corroborating this conclusion, when asked this question directly, each of the Lenders' witnesses credibly denied that they viewed Clause (o) as a source of entitlement.[515]

Kohlberg's own conduct reveals that it did not view the Principles or any aspect of the DCL as a source of entitlement to the Addback Demands. If Kohlberg believed that Clause (a) and Clause (o) individually or collectively covered lost revenue due to COVID-19, it could have simply signed a credit agreement with those terms and applied the addbacks when measuring EBITDA.[516] Alternatively, Kohlberg could have expressed this

---

[513] *See, e.g., id.* Ex. B, at B-26–27 (stating that the final credit agreement between Kohlberg and the Lenders shall "be consistent with [the DCL] . . . and shall be based on, and otherwise substantially similar to and not less favorable to [Kohlberg] . . . than . . . the Precedent Credit Agreement . . . and the related ancillary agreements" (emphasis omitted)); *id.* Ex. B, at B-27 (calling for the parties to use a precedent credit agreement as the basis for their credit agreement but allowing for modifications to the precedent agreement to "reflect the operational and strategic requirements" of DecoPac as compared to the precedent target company).

[514] *See id.*

[515] *See* Trial Tr. at 784:8–788:1 (Antares); *id.* at 815:14–816:5 (Owl Rock); *id.* at 969:20–970:16 (Ares); Churchill Dep Tr. 38:11–18.

[516] Kohlberg disputes this point, arguing that it "ignores that it takes more than one party to sign a credit agreement" and that "Kohlberg and the Lenders needed to agree on what,

position when negotiating the Financing Demands with the Lenders. In those communications, however, Kohlberg did not once claim that it was entitled to the demands, nor did it reference Clause (a) or Clause (o). As yet another alternative, Kohlberg could have sued the Lenders to compel them to include the Addback Demands in a credit agreement.[517] Kohlberg did none of these things, thereby suggesting that not even Kohlberg believed that it was entitled to the Addback Demands when it was negotiating with the Lenders.

In sum, Kohlberg's newly minted entitlement argument fails. Neither Clause (a) nor Clause (o) independently or together entitle Kohlberg to the Addback Demands, and neither the Lenders nor Kohlberg believed that they did when they were negotiating the Financing Demands. The analysis thus turns to whether Kohlberg's Financing Demands spoke to open terms of the DCL.

### b. The Open-Terms Argument

It is difficult to conclude that the Financing Demands spoke to truly open terms. Of the three categories of demands within the defined term "Financing Demands," Kohlberg offers argument in briefing as to the Addback Demands only. Kohlberg does not argue

---

exactly, constituted 'extraordinary, unusual or non-recurring losses, gains or expenses' in the definitive credit agreement." Defs.' Post-Trial Reply Br. at 18. Kohlberg cites to the precedent EN Engineering deal, where the commitment letter's "Clause (a)" counterpart contained language nearly identical to the DCL's Clause (a), but the final agreement contained a more detailed definition. *Id.* (citing JX-125 § 1.01, at 17–20; JX-416 Ex. B, at B-41–43). But this merely indicates that a more detailed definition *can* be agreed upon—not necessarily that a more detailed definition *must* be agreed upon.

[517] Kohlberg acknowledged this alternative in its post-trial reply brief. Defs.' Post-Trial Reply Br. at 55.

that either the Holiday Demand or the Revolver Demand speak to open terms, nor can they. The Holiday Demand sought to blue pencil Kohlberg's previous agreement that covenant compliance would be tested as of "the last day of the second full fiscal quarter ended after the Closing Date."[518] The Revolver Demand sought to blue pencil the most critical term concerning the revolver—its dollar amount—which too was expressly negotiated by the parties.[519] Kohlberg's own expert admitted that both demands were outside of the scope of open terms.[520]

Because Kohlberg was obligated to use its reasonable best efforts to enter into a final credit agreement on the terms of the DCL, its insistence on the better terms of the Holiday Demand and the Revolver Demand constituted a breach of Section 6.15(a).[521]

The question becomes whether the Addback Demands spoke to open terms, an analysis that rehashes aspects of Kohlberg's entitlement argument concerning Clause (a) and Clause (o).

Again, if Clause (a) entitled Kohlberg to addbacks for COVID-19-related revenue losses, as Kohlberg argues, then those losses were expressly capped at $15 million. By seeking uncapped addbacks and then a $35 million cap, Kohlberg sought to blue-pencil the

---

[518] *See* DCL Ex. B, at B-38.

[519] *See id.* at 1.

[520] *See* Trial Tr. at 1600:21–1601:10 (Foster) (admitting that "upsizing of the revolver" was "outside the DCL"); Foster Dep Tr. at 112:2–9 (same as to the covenant holiday).

[521] *See In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *112–13 (Del. Ch. Aug. 31, 2020) (holding that insisting on additional rights and imposing additional conditions breached an efforts provision).

previously negotiated $15 million cap of Clause (a) to achieve better terms, which would constitute breach of Section 6.15(a).

Thus, the Addback Demands only speak to open terms if they fall wholly within the catchall reference to First Lien Documentation Principles of Clause (o).

Although Kohlberg makes no compelling argument to this effect, this decision assumes, for the sake of argument, that the Principles provided a basis for Kohlberg to seek addbacks for COVID-19-related revenue losses.

### c. The Acceptable-to-Buyer Argument

Before turning to Kohlberg's argument that it had reasonable grounds for the Addback Demands, this decision must first revisit an argument raised by Kohlberg on its motion to dismiss concerning the meaning of Section 6.15(a)'s reference to Debt Financing being "acceptable to the Buyer."

The acceptable-to-buyer argument first featured in Kohlberg's motion to dismiss, where Kohlberg argued that this phrase allowed it to renegotiate terms of Debt Financing in between signing and closing and to walk away from the DCL in the event it did not secure "*terms and conditions acceptable to the Buyer*."[522]  Effectively, Kohlberg interpreted Section 6.15(a)'s requirement that Kohlberg to use reasonable best efforts as a source of continuing discretion to unilaterally object to unacceptable terms of Debt Financing.

---

[522] Defs.' Mot. to Dismiss Opening Br. at 7, 41–42 (quoting SPA § 6.15(a) (emphasis added)).  Kohlberg coupled this language with provisions of the DCL like "Clause (o)" (discussed in the next section) to suggest that certain terms remained open to negotiation. *Id.* at 9–10; *see also* Defs.' Post-Trial Opening Br. at 27–29.

The court rejected this strident interpretation in the Motion to Dismiss Bench Ruling, concluding that such an interpretation could not be reconciled with multiple other aspects of the contractual scheme including Section 6.15(a) or Section 6.15(b).[523] The court reasoned that "[t]he contractual scheme cannot provide both that [Kohlberg], on the one hand, *may* unilaterally block the Debt Financing and, on the other hand, *must* use best efforts to obtain the Debt Financing."[524]

The court left open the possibility that perhaps there was a way to harmonize a version of Kohlberg's acceptable-to-buyer argument with the contractual scheme. In a passage of the bench ruling, the court suggested that *if* the scheme permitted Kohlberg to renegotiate EBITDA addbacks—a conclusion the court expressly declined to reach—then perhaps Section 6.15(a) would operate as a check on Kohlberg's ability to negotiate financing by foreclosing Kohlberg from demanding unreasonable terms.[525] As is often the case with bench rulings, the reasoning was under-developed. It expressly left open the possibility that other interpretations might help harmonize the provisions of the contractual scheme.

Plaintiffs seized on this opening, offering in their post-trial brief an interpretation of Section 6.15(a) that reconciles the acceptable-to-buyer language with the other obligations

---

[523] Mot. to Dismiss Bench Ruling at 13–21.

[524] *Id.* at 19–20 (emphasis added) (reasoning that "[r]eading the acceptable-to and catch-all provisions to permit [Kohlberg] to unilaterally block the debt financing by demanding any terms subjectively acceptable to it would render the reasonable best efforts provision mere surplusage and run contrary to the contractual scheme").

[525] *Id.* at 20–21.

and restrictions of Section 6.15. As Plaintiffs observe, Section 6.15(a) provides that the general obligation to "use its reasonable best efforts to arrange and obtain the Debt Financing on terms and conditions acceptable to the Buyer, *includ[es]*" a series of more specific obligations.[526] Pointing to a discussion of a similarly nested provision in *AB Stable*, Plaintiffs argue that "[t]he 'including' clause confirms that [the] general obligation 'includ[es]' an obligation to use commercially reasonable efforts to accomplish the . . . enumerated items."[527] Applying this reasoning to Section 6.15(a), Plaintiffs argue that Kohlberg must, at a minimum, use commercially reasonable efforts to satisfy the specific enumerated items.

Read together with the acceptable-to-buyer language, the specific obligations that follow the more general efforts obligation must therefore be viewed as definitionally "acceptable." Among those specific obligations is Kohlberg's obligation to "enter into definitive agreements with respect to the Debt Financing that are on terms and conditions no less favorable to Buyer than those contained in the [DCL]."[528] Thus, it must follow that the terms of the DCL are "acceptable" to Kohlberg.[529]

---

[526] *See* SPA § 6.15(a) (emphasis added).

[527] *AB Stable*, 2020 WL 7024929, at *90 (third alteration in original).

[528] SPA § 6.15(a).

[529] *See* Trial Tr. at 1603:21–1604:7 (Foster) (agreeing that Kohlberg could not "sign a DCL that was acceptable on the date that the [SPA] was signed, March 6, and later say '[t]hat DCL is no longer acceptable to us'"); *see also id.* at 1596:14–19 (Foster) (agreeing that the SPA did not "empower Kohlberg to negotiate for a credit agreement that was outside the terms and conditions of the DCL").

In view of the court's ruling on the motion to dismiss, Kohlberg does not meaningfully dispute Plaintiffs' interpretation, but instead argues that "[t]o have any independent meaning, the 'acceptable to the Buyer' clause must, at the least, require that *open* terms in the DCL be resolved in a manner acceptable to Kohlberg."[530]

This decision adopts Kohlberg's newest articulation of the acceptable-to-buyer language, concluding that Kohlberg had the right to insist on acceptable provisions as to open terms, limited by its efforts obligations, including the obligation to use "commercially reasonable efforts to . . . enter into definitive agreements with respect to the Debt Financing."[531]

### d. The Reasonable-Grounds Argument

Kohlberg contends that it complied with its efforts obligations when negotiating open terms of the DCL because it had reasonable grounds for the Financing Demands given its concern that the Company would breach the Financial Covenant at its first testing.

The obligations to use "reasonable best efforts" and "commercially reasonable efforts" each required Kohlberg to "take all reasonable steps to solve problems and consummate the" enumerated obligations.[532] In this context, the analysis considers whether Kohlberg "(i) had reasonable grounds to take the action it did and (ii) sought to

---

[530] Defs.' Post-Trial Reply Br. at 13.

[531] *Id.*

[532] *See supra* notes 494–497 and accompanying text.

address problems with its counterparty."[533] Moreover, this court has been hesitant to find that a party took reasonable best efforts to solve a problem where the party "did not raise their concerns before filing suit, did not work with their counterparties, and appeared to have manufactured issues solely for purposes of litigation."[534]

Even assuming that the Addback Demands spoke to open terms to be negotiated in accordance with the Principles, it is difficult to conclude that Kohlberg complied with its obligations when negotiating them.

To show that it complied with its obligations under Section 6.15(a) when making the Addback Demands, Kohlberg relies on the March 26 Model, which projected that Kohlberg would violate the Financial Covenant when first tested. To Kohlberg, it was reasonable to demand addbacks to avoid closing into a potential covenant breach. When the Lenders refused both the initial uncapped demand and the later $35 million capped addback, it became apparent to Hollander that the Lenders were not willing to give any EBITDA addbacks for COVID-19-related revenue loss in the final credit agreement.[535] Each of the Lenders confirmed this, testifying that, as a blanket policy, they were not granting borrowers addbacks for COVID-19-related revenue losses.[536] Kohlberg cites

---

[533] *Akorn*, 2018 WL 4719347, at *91. In *Akorn*, Vice Chancellor Laster articulated the holding of *Williams* as a non-exclusive test, observing that "this court has looked" at the two identified factors while stopping short of saying that this court *must* look to those two factors. *Id.*

[534] *See id.*

[535] Trial Tr. at 548:21–549:21 (Hollander).

[536] *See id.* at 794:23–795:5 (Antares); *id.* at 824:23–825:2 (Owl Rock); *id.* at 969:14–19 (Ares); Churchill Dep. Tr. at 104:14–24.

these facts, contending that its efforts were reasonable and that Section 6.15(a) did not require Kohlberg to close into a covenant breach.

Kohlberg's theory rests on a faulty premise—that the March 26 Model was created for the purpose of forecasting the Company's actual performance and that it was reasonable to rely on the Model for that purpose. The events that led to the March 26 Model reveal the problem with that premise:

- Kohlberg's remodeling efforts began less than one day after a March 18 call with Kohlberg's outside litigation counsel.[537]

- Kohlberg had near-daily calls with its outside litigation counsel after March 18.[538]

- By March 23, Woodward was discussing the acquisition using conditional language ("*if* we decide we have to own it"),[539] and Hollander had given McKinney and Forrey the impression that Kohlberg had its "mind made up."[540]

- After McKinney and Forrey developed the impression that Kohlberg was seeking to terminate the deal, they prepared two "downside" models.[541]

- Of the two downside cases, McKinney and Forrey thought the Downside #1 Case—the model that did not project a covenant breach—was a "good place to start."[542]

---

[537] *See* JX-883; JX-891; JX-995 at 5; Trial Tr. at 698:16–699:6 (Hollander).

[538] JX-1910; PDX-6.

[539] JX-1000 at 1 (emphasis added).

[540] JX-996 at 1.

[541] *See* JX-998 at 1.

[542] *See id.*

- Only the second model—the GW Case—projected a covenant breach.[543]

- By March 23, Kohlberg still had not sought input from the Company about performance for its remodeling efforts.[544]

- On March 23, Hollander and Forrey spoke on the phone for sixteen minutes; immediately after the call ended, Forrey sent McKinney a copy of the updated model, which used the GW Case as the base case.[545]

- On March 24, after Kohlberg already had its "mind made up," Kohlberg requested information from Anderson, based on the false premise that the Lenders had requested additional information.[546]

- On March 25, the Company responded to Kohlberg's data requests.[547]

- On March 26, the Company finalized its new model based on the GW Case. Nearly as pessimistic as the GW Case, the new model projected that the Company's adjusted EBITDA would fall from $48.3 million for 2019 to $10.5 million for 2020 and thus that the Company would be in breach of the Financial Covenant when first tested.[548]

- Kohlberg's witnesses failed to explain the basis for the assumptions underlying the March 26 Model.[549]

---

[543] *See* JX-996 at 1–2 (referring to the GW Case as "obviously support[ing] their case given how severe the downside is"); Trial Tr. at 1278:9–18 (McKinney) (agreeing that the GW Case "was a bad case that supported requesting an add-back from the lenders to avoid a covenant breach").

[544] *See* Trial Tr. at 208:9–211:15 (Anderson); *id.* at 523:16–527:4 (Hollander).

[545] *See* JX-967 at 202; JX-994 at 1.

[546] *See* JX-996 at 1; Trial Tr. at 208:9–212:2 (Anderson); *id.* at 523:16–527:4 (Hollander).

[547] JX-1058.

[548] *See* JX-1064 at cells at N26, S26. The model predicted April, May, and June year-over-year sales decreases of 78.0%, 80.9%, and 64.2%, respectively, despite DecoPac never having recorded a year-over-year weekly decrease of more than 63.9%. *Compare* DDX-1.9 (projecting monthly declines of 78.0%, 80.9%, and 64.2% in April, May, and June, respectively), *with* DDX-3.25 (even omitting auto sales, showing no week worse than 63.9% decline), *and* JX-2432 (same).

[549] *See supra* notes 195, 238–240 and accompanying text.

- Kohlberg did not wait for the Company's reforecast before sending the March 26 Model to the Lenders.[550]

- On March 26, the Company sent Kohlberg its reforecast based on actual sales data, communications with customers, and decades of experience; this reforecast was similar to McKinney's first downside case.[551]

- Seventeen minutes after receiving the Company's reforecast, Kohlberg rejected it as "illogically optimistic."[552]

- Kohlberg did not use the Company's reforecast to tweak its Model and never shared the Company's reforecast with the Lenders.[553]

- Kohlberg did not update the Lenders after sales data from the first two weeks of April proved that its projections were inaccurate or for any other reason during the nearly seven weeks until the DCL expired.[554]

This contemporaneous evidence leads to the conclusion that the March 26 Model was predestined to reflect a covenant breach as a platform for Kohlberg to make the Financing Demands rather than any genuine effort to forecast DecoPac's performance.

---

[550] *See* PTO ¶ 21; JX-1062; JX-1064.  According to Hollander, Kohlberg did not wait for DecoPac's reforecast because, based on a thirty-minute conversation on March 24, he "didn't think [the reforecast] would be credible."  *See* Trial Tr. at 728:14–730:6 (Hollander).

[551] *Compare* JX-1066, *with* JX-998.  Although Hollander explained to the Kohlberg team that DecoPac's management had discussed with him the assumptions underlying their reforecast, Hollander dismissed them simply because he "continue[d] to believe that their forecast [was] extremely overly optimistic and out-of-touch with the current reality."  JX-1183 at 4.  Kohlberg's ready dismissal of DecoPac management projections, which "would seem highly relevant," cuts against the legitimacy of the March 26 Model.  *See Channel Medsystems*, 2019 WL 6896462, at *30 (faulting buyer that failed to raise concerns with management, make any effort to understand management's response, or hire an outside consultant to examine the purported issue).

[552] *See* JX-1066 at 1; JX-1074 at 1.

[553] *See* JX-1062; JX-1064; JX-1074; Trial Tr. at 743:6–750:3–13 (Hollander); *id.* at 1390:8–1392:8 (Forrey).

[554] Trial Tr. at 1263:4–1266:1 (McKinney); *see id.* at 1390:8–1392:8 (Forrey).

Kohlberg's witnesses denied this at trial,[555] but their statements are less credible than the contemporaneous evidence.

Kohlberg argues that the Lenders' refusal to grant addbacks for COVID-19-related revenue losses amounts to a "failure to engage in a meaningful back-and-forth."[556] But the fact that every Lender has a blanket policy against granting the Addback Demands cuts against the reasonableness of these demands, not the opposite. Ultimately, the Lenders' policy does not inform whether Kohlberg complied with its obligations when making the demands. That determination hinges on the reasonableness of Kohlberg's efforts.

In the end, the conclusion is unavoidable: Kohlberg did not use reasonable best efforts to obtain Debt Financing based on the terms of the DCL. Kohlberg did not "work with [its] counterparties" in such a way that was likely to solve the problems it faced, and its arguments appear to have been "manufactured . . . solely for purposes of litigation."[557] Because Kohlberg's only post-signing efforts to obtain Debt Financing under Section 6.15(a) relied on the March 26 Model, Kohlberg failed to use its reasonable best efforts. Kohlberg thus breached its obligations under Section 6.15(a).

### 2.    Alternative Financing

Section 6.15(d) of the SPA provides:

> If, notwithstanding the use of reasonable best efforts by Buyer
> to satisfy their respective obligations under this Section 6.15,
> the Debt Financing or the Debt Commitment Letter (or any

---

[555] *See, e.g.*, *id.* at 571:16–574:18 (Hollander); *id.* at 1229:23–1230:24 (McKinney*); id.* at 1340:9–1341:16 (Forrey*); id.* at 1423:1–5 (Woodward).

[556] Defs.' Post-Trial Opening Br. at 79.

[557] *See Akorn*, 2018 WL 4719347, at *91.

definitive financing agreement relating thereto) expire or are terminated or become unavailable prior to the Closing, in whole or in part, for any reason, Buyer shall . . . use its reasonable best efforts promptly to arrange for alternative financing from reputable financing sources (which, when added with the Equity Financing, shall be sufficient to pay the amounts required to be paid under this Agreement from other sources) . . . .[558]

Because Section 6.15(d) only applies if Kohlberg has first used reasonable best efforts to satisfy its obligations under Section 6.15(a), this decision need not reach the question of whether Kohlberg satisfied its obligation to seek alternative financing under Section 6.15(d).

It bears noting, however, that Kohlberg's efforts to seek alternative Debt Financing were unreasonable for similar reasons to those that underpinned Kohlberg's breach of its obligations under Section 6.15(a). On the day that Mantel informed Hollander that he expected Kohlberg to seek alternative financing, Kohlberg contacted Houlihan Lokey to conduct a market check for alternative financing options.[559] Given the number of lenders with which Houlihan Lokey regularly interacts, Kohlberg was effectively gauging the financing market as a whole.[560] By April 3, Houlihan Lokey had reported to Kohlberg that any debt potentially available would be on terms significantly less favorable than those in the DCL.[561] Kohlberg also reached out to Madison Capital, who was an existing lender to

---

[558] SPA § 6.15(d) (emphasis omitted).

[559] Trial Tr. at 576:10–577:16 (Hollander).

[560] *Id.* at 576:20–577:12 (Hollander); *id.* 1589:22–1590:20 (Foster).

[561] *Id.* at 579:4–23 (Hollander); *see* JX-1282.

DecoPac, but Madison Capital was not interested in lending on the terms that Kohlberg was seeking.[562]

Although Kohlberg's initial efforts to investigate potential alternative financing options were facially reasonable, Kohlberg too easily and conveniently accepted defeat. And although it is true that Kohlberg's obligation to seek alternative financing did not extend in perpetuity, it is equally true that best efforts likely required more than just four days of inquiries. Yet, from April 5 forward, during the five weeks before the DCL expired, Kohlberg never endeavored to find alternative financing.[563] After the DCL expired, Kohlberg made no efforts whatsoever to find alternative financing. Regardless, Kohlberg's failure to satisfy its obligation under Section 6.15(a) renders this point moot.

## C. Remedies

Plaintiffs ask the court to order specific performance and force Kohlberg to close on the SPA. Alternatively, they ask the court to order Kohlberg to use reasonable best efforts to obtain alternative debt financing.

"A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[564] This court has not hesitated to order specific

---

[562] Trial Tr. at 580:10–581:23 (Hollander).

[563] *See id.* at 581:24–582:14, 776:3–13 (Hollander*)*; *id.* at 1435:14–22 (Woodward).

[564] *Osborn v. Kemp*, 991 A.2d 1153, 1158, 1161 (Del. 2010) ("When balancing the equities we must be convinced that the specific enforcement of a validly formed contract would not cause even greater harm than it would prevent." (cleaned up)).

performance in cases of this nature,[565] particularly where sophisticated parties represented by sophisticated counsel stipulate that specific performance would be an appropriate remedy in the event of breach.[566]

Here, the parties stipulated to the remedy of specific performance,[567] but that stipulation applies "*if and only if . . .* the full proceeds of the Debt Financing *have been funded* to Buyer on the terms set forth in the [DCL] to fund the payment of the Estimated

---

[565] *See, e.g.*, *Channel Medsystems, Inc. v. Boston Sci. Corp.*, 2019 WL 7293896, at ¶ 4 (Del. Ch. Dec. 26, 2019) (Order & Final Judgment) (ordering specific performance of merger agreement); *Hexion*, 965 A.2d at 763 (ordering specific performance of merger agreement, including obligation to use reasonable best efforts to consummate the financing); *IBP*, 789 A.2d at 84 (ordering specific performance of merger agreement).

[566] *See, e.g.*, *Channel Medsystems*, 2019 WL 6896462, at *39 ("Although this [specific performance] provision does not tie the court's hands in fashioning appropriate equitable relief, it reflects the parties' understanding that specific performance would be available in this circumstance, which is entirely consistent with past Delaware cases granting specific performance for failure to perform under a merger agreement."); *Hexion*, 965 A.2d at 759–63 (finding specific performance appropriate where a provision in a merger agreement provided for specific performance in certain circumstances); *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) ("If the Stockholder Agreement was silent as to the availability of specific performance, Gildor would bear the burden of showing that a legal remedy would be inadequate. . . . But, given Delaware's public policy of favoring freedom of contract, there is no need to make that inquiry. . . . Delaware courts do not lightly trump the freedom to contract and, in the absence of some countervailing public policy interest, courts should respect the parties' bargain.").

[567] *See* SPA § 11.14(a) (providing that "the other parties would be damaged irreparably in the event any of the provisions of the Agreement are not performed in accordance with their specific terms or otherwise are breached," that "the remedies at law would not be adequate to compensate such other parties not in default or breach," and that "each of the parties agrees that the other parties will be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions of this Agreement in addition to any other remedy to which they may be entitled, at law or in equity"). The SPA does not automatically expire and was not validly terminated; it thus remains in effect. *See id.* § 8.1.

Closing Payment at Closing (or would be funded at the Closing if the equity Financing is substantially contemporaneously funded at the Closing)" (the "debt-funding condition").[568]

Kohlberg moved to dismiss Plaintiffs' claim for specific performance on the basis of the debt-funding condition, arguing that Plaintiffs' claim for specific performance is barred because it is undisputed that the full proceeds of the Debt Financing were not funded. The court denied this motion in the Motion to Dismiss Bench Ruling, holding that Kohlberg may not rely on the absence of Debt Financing to avoid specific performance if Plaintiffs prove facts to support the application of the prevention doctrine.[569]

Plaintiffs' post-trial entitlement to specific performance therefore depends on whether the prevention doctrine applies.

The prevention doctrine provides that "where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[570]

> To establish that a party's breach contributed materially to the non-occurrence of a condition, it is not necessary to show that the condition would have occurred but for the lack of cooperation. It is only required that the breach have contributed materially to the non-occurrence. A breach "contributed materially" to the non-occurrence of a condition if the conduct made satisfaction of the condition less likely. But if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-

---

[568] *Id.* § 11.14(b) (emphasis added).

[569] Mot. to Dismiss Bench Ruling at 39–42.

[570] *Id.* at 31 (quoting *Restatement (Second) of Contracts* § 245 (1981)).

> occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach.[571]

At trial, Plaintiffs demonstrated that Kohlberg's breach of Section 6.15(a) contributed materially to Kohlberg's failure to obtain Debt Funding. Plaintiffs proved that each of the Lenders were willing to execute Debt Financing on the terms of the DCL and that Kohlberg refused to move forward. In the words of one of the Lenders, when Kohlberg made the Financing Demands, "they changed the ask and risk profile of the deal and were not willing to adjust the economics, so they were really looking for a way out."[572] The non-occurrence of Debt Financing, therefore, was due materially to Kohlberg's failure to move forward toward a final credit agreement on the terms of the DCL.

Kohlberg asserts three arguments for why the court should not reach this conclusion. Kohlberg first argues that it did not prevent Debt Financing from being funded because the DCL expired by its own terms on May 12, 2020. This argument is overly simplistic and ignores that the DCL expired because Kohlberg refused to move forward on its terms. By doing so, Kohlberg effectively ran out the clock while the Lenders were standing by willing to close. Kohlberg thus cannot argue that timing prevented the debt-funding condition.

---

[571] *Anthem-Cigna*, 2020 WL 5106556, at *91 (cleaned up); *see also WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., LLC*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) (providing that a party "cannot rely on the failure of a condition to excuse its performance when its own conduct materially caused the condition's failure").

[572] JX-1267 at 1.

Kohlberg next argues that it was justified in refusing to negotiate definitive financing agreements under the terms of the DCL. This point essentially repackages the defenses to Plaintiffs' claim under Section 6.15, but those arguments fare no better.

Kohlberg finally argues that the prevention doctrine requires Plaintiffs to prove that Kohlberg acted in bad faith, which Delaware law defines in this context as conscious disregard of a relevant contractual duty.[573] To Kohlberg, it is not sufficient to demonstrate that Kohlberg breached its obligations and that such breach materially contributed to the absence of a condition; Plaintiffs must prove that Kohlberg acted in bad faith when breaching its obligations.

Kohlberg's position is contrary to black-letter law, as set forth in the *Restatement (Second) of Contracts*, which supplies the basis for Delaware's formulation of the prevention doctrine.[574] Under the *Restatement*, the relevant question is limited to whether a party's breach "contribute[d] materially to the non-occurrence of a condition."[575] The *Restatement* does not call for the court to analyze the subjective intent of the breaching

---

[573] *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104–06 (Del. 2013); *see also ev3, Inc. v. Lesh*, 114 A.3d 527, 540–41 (Del. 2014) (holding that, where a buyer had an obligation to exercise its good faith discretion regarding certain milestone payments to seller's former stockholders after consummation of a merger, dereliction of that contractual duty "could be bad faith if the expected profits to [buyer] were commercially reasonable and [buyer] nonetheless acted to delay accomplishment of the milestones so as to shift additional profits its way at the expense of the former [seller] shareholders").

[574] *See Anthem-Cigna*, 2020 WL 5106556, at *90 ("Delaware has adopted the framework set forth in the *Restatement (Second) of Contracts*." (citing *Williams*, 159 A.3d at 273; *WaveDivision*, 2010 WL 3706624, at *14–15)).

[575] *Restatement (Second) of Contracts* § 245.

party when conducting this inquiry.[576]  Nor have cases applying this doctrine required the court to undertake such an analysis.

Kohlberg cites three sources for its interpretation:  this court's decision in *Mobile Communications*, a passage from *Williston on Contracts*, and the court's Motion to Dismiss Bench Ruling.[577]  A careful reading of these authorities reveals that they do not support Kohlberg's interpretation.

*Mobile Communications* involved a letter agreement under which the defendant-seller agreed to sell certain assets to the plaintiff-purchaser.[578]  The agreement conditioned the sale on the approval of the seller's board.[579]  After the parties executed the agreement, two members of the seller's management team expressed concerns about the transaction.[580]

---

[576] *See id.* (limiting the inquiry only to the materiality of a party's breach on the non-occurrence of a condition).  The *Restatement* notes that the "additional duty of good faith and fair dealing" requires "some cooperation . . . either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence," but it does not necessitate an inquiry into a party's bad faith.  *Id.* cmt. a.  Instead, the prevention doctrine "only applies . . . where the lack of cooperation constitutes a breach . . . of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court."  *Id.*  In other words, the analysis focuses on the materiality of a breach in connection with the non-occurrence of a condition—it places no emphasis on bad faith in connection with the breach.  *See id.* cmt. b ("It is only required that the breach have contributed materially to the non-occurrence . . . .").

[577] Defs.' Post-Trial Opening Br. at 103–04 (citing *Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp.*, 1985 WL 11574, at *3–4 (Del. Ch. Aug. 27, 1985); 13 *Williston on Contracts* § 39:10 (4th ed. 2020)); Defs.' Post-Trial Reply Br. at 54 (citing *Mobile Commc'ns*, 1985 WL 11574, at *3–4; 13 *Williston on Contracts* § 39:10; Mot. to Dismiss Bench Ruling at 36).

[578] *Mobile Commc'ns*, 1985 WL 11574, at *1.

[579] *Id.* at *2.

[580] *Id.*

During the board meeting at which the transaction was considered, they advised the board that the buyer had misled the seller "and could not be trusted to consummate the transaction in a satisfactory manner," and the board unanimously voted to reject the sale.[581] The purchaser filed litigation to specifically enforce the letter agreement, arguing in part that the condition requiring board approval must be deemed waived under the prevention doctrine because the seller's management wrongfully interfered with the process of obtaining board approval.[582]

On the purchaser's motion to preliminary enjoin the seller from transferring the same assets to another buyer, the court concluded that the purchaser was unlikely to prevail.[583] In reaching this conclusion, the court articulated the prevention doctrine as requiring some *wrongful* conduct preventing the condition.[584] In fashioning its theory of what constituted "wrongful" conduct, the purchaser drew upon the California decision *Jacobs v. Freeman*.[585] *Jacobs*, like *Mobile Communications*, involved a condition—board approval—wholly within the power of the selling party to accomplish.[586] The *Jacobs* court

---

[581] *Id.* at *3.

[582] *Id.*

[583] *Id.* at *3–5.

[584] *Id.* at *4 (describing the "prevention doctrine" as "provid[ing] that a party may not escape contractual liability by reliance upon the failure of a condition precedent where *the party wrongfully prevented performance of that condition*" (emphasis added) (citing *Gulf Oil Corp. v. Am. La. Pipeline Co.*, 282 F.2d 401 (6th Cir. 1960); 3A *Corbin on Contracts* § 767 (1961))).

[585] *See id.* *4 (citing *Jacobs v. Freeman*, 104 Cal. App. 3d 177 (Cal. Ct. App. 1980)).

[586] *See Jacobs*, 104 Cal. App. 3d 177, 177–78.

observed that "there is an *implied* obligation on the part of the seller's officers to carry out the objectives of the contract in good faith by submitting the proposal to the board."[587] Adopting this reasoning in *Mobile Communications*, the court analyzed whether the seller's board acting wrongfully by failing to consider the agreement in good faith.[588] Because the court concluded that the board had acted in good faith, the court found that the seller had not acted wrongfully and rejected application of the prevention doctrine.[589]

In this case, unlike in *Mobile Communications* and *Jacobs*, the analysis of whether Kohlberg acted wrongfully does not require the court to resort to the implied covenant of good faith. Rather, the express terms of SPA speak to Kohlberg's obligations in connection with the relevant condition of obtaining Debt Financing. The parties expressly contracted in Section 6.15 that Kohlberg would use its reasonable best efforts to accomplish that goal. This decision has already found that Kohlberg acted wrongfully by breaching this obligation. The only remaining inquiry relevant to the prevention doctrine is whether that wrongful conduct materially contributed to the non-occurrence of the condition. As discussed above, it did.

Kohlberg's reliance on *Williston* is also misplaced. Kohlberg quotes the following passage from that treatise: "[T]he weight of authority holds that in order for prevention to constitute an excuse for nonperformance of a condition . . . , the preventing party must have deliberately taken steps to impede performance or have arbitrarily impaired the other

---

[587] *Id.* at 190 (emphasis added).

[588] *Mobile Commc'ns*, 1985 WL 11574, at *4.

[589] *Id.* at *4–5.

party's ability to perform."[590] This passage, however, does not predicate application of the prevention doctrine on a finding of bad faith, but rather, on some form of deliberate action. Moreover, Kohlberg omits language surrounding the quoted passage. The omitted clause immediately preceding the quoted passage states that "it is *not necessary that there be a specific malevolent intent.*"[591]

Kohlberg's reliance on an excerpt from the Motion to Dismiss Bench Ruling is equally unpersuasive. As an initial matter, the lengthy ruling cited to several authorities when analyzing the prevention doctrine, including *Williston*.[592] From this extended discussion, Kohlberg chose to excise the single statement that comes closest to supporting Kohlberg's theory: that the "prevention doctrine would only nullify the funding condition"

---

[590] Defs.' Post-Trial Opening Br. at 103–04 (quoting 13 *Williston on Contracts* § 39:10).

[591] 13 *Williston on Contracts* § 39:10 (emphasis added). The footnotes clarifying this passage of *Williston* include cases where the failure to achieve a condition was due to some external factor indirectly attributable to the party in breach. *See Omaha Pub. Power Dist. v. Emps.' Fire Ins. Co.*, 327 F.2d 912, 916–17 (8th Cir. 1964) (holding that a contractor's failure to maintain insurance due to financial hardship was not a "deliberate[]" step constituting prevention); *Keystone Bus Lines, Inc. v. ARA Servs., Inc.*, 336 N.W.2d 555, 557 (Neb. 1983) (rejecting applicability of the prevention doctrine and excusing a purchaser's post-acquisition contractual payouts where "[g]ood faith governed the business decisions" resulting in non-occurrence of the conditions to those payouts and the purchaser made those business decisions "after the parties entered into their agreement"). At best, those cases highlight a "good faith" defense to application of the prevention doctrine, rather than imposing an affirmative "bad faith" requirement on the doctrine's applicability as Kohlberg suggests. Kohlberg, however, has failed to show that such a defense is applicable here. As discussed above and further discussed below, the court is unpersuaded that Kohlberg acted in good faith with respect to the March 26 Model and the Financing Demands.

[592] *See* Mot. to Dismiss at 30–33 (discussing analyses of the prevention doctrine in the *Restatement (Second) of Contracts*, *Williston on Contracts*, *Farnsworth on Contrasts*, *Anthem-Cigna*, and *WaveDivision*).

121

if Kohlberg "actively scuttle[d] the debt financing," a phrase that evokes the concept of the deliberate sinking of a ship.[593] In context, this passage is best read as standing for the proposition that the deliberate scuttling would suffice to warrant application of the prevention doctrine. It does not, however, stand for the proposition that "scuttling" was *necessary* to warrant application of the prevention doctrine. Nor does it stand for the proposition that "scuttling" requires a finding of bad faith as opposed to some other deliberate action.

Although the court need not reach this issue, it bears noting that Kohlberg's protestations of good faith are suspect. Kohlberg's position would be more persuasive if its representative had not made multiple calls to litigation counsel beginning on March 18 but none to DecoPac management in the days before he told his team to make new models.[594] In the end, under the facts of this case, there is no requirement that Plaintiffs demonstrate bad faith to meet its burden under the prevention doctrine. Because Kohlberg's subjective good faith when breaching the SPA is irrelevant, the court need not undertake the unhappy task of determining whether Kohlberg was as well-intentioned as it portrays in briefing.

In sum, under the prevention doctrine, Kohlberg is barred from asserting the absence of Debt Financing as a basis to avoid specific performance under Section 11.14(b). At

---

[593] Defs.' Post-Trial Reply Br. at 54 (quoting Mot. to Dismiss at 36).

[594] *See* JX-1910; PDX-6; Trial Tr. at 605:4–609:7, 693:8–694:22 (Hollander).

bottom, Plaintiffs have provided clear and convincing evidence that the balance of equities tips in their favor. Kohlberg is therefore obligated to close on the SPA.

Plaintiffs suggest that Kohlberg should be ordered to close within fifteen days of this decision, but they do not provide any context-specific support for that proposition.[595] Within five business days, the parties shall provide supplemental submissions on what deadline the court should impose for complying with this decision.

Plaintiffs have also demonstrated that they are entitled to specific performance of Kohlberg's obligation to use reasonable best efforts to obtain alternative financing, although this conclusion is likely eclipsed by the holding that Kohlberg must close on the SPA. Kohlberg breached its obligation, which precedent and Section 11.14 deem specifically enforceable, so Plaintiffs are entitled to an order of specific performance.[596]

"An order of specific performance . . . will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice so requires."[597] As is the case here, an order of specific performance "seldom results in performance within the time the contract requires."[598] To that end, "damages for the delay will usually be

---

[595] *See* Pls.' Post-Trial Opening Br. at 99–100 (citing *Channel Medsystems*, 2019 WL 7293896, at ¶ 4 (ordering closing to occur no later than fifteen calendar days after the entry of the Final Order and Judgment)).

[596] *See, e.g.*, *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 2008 WL 4409466, at ¶ 3 (Del. Ch. Sept. 29, 2008) (Order & Final Partial Judgment) (ordering specific performance of reasonable best efforts with lenders).

[597] *Restatement (Second) of Contracts* § 358(1).

[598] *Id.* § 358 cmt. c.

appropriate."[599]  Plaintiffs therefore seek prejudgment interest on the deal price at the legal rate from the outside closing date of May 4, 2020.

Plaintiffs' request finds support in decisions of this court granting prejudgment interest on the purchase price when ordering specific performance.[600]  In *Osborn*, for example, the court awarded specific performance of a land sale contract in 2009 that otherwise would have afforded the buyer "the right to acquire the Property . . . on April 16, 2005."[601]  Recognizing that timely consummation of the transaction also meant that the seller "would have had [the purchase price] as of that time," the court held that the buyer "also must pay to [the seller] interest on the outstanding purchase price of $50,000 at the legal rate as of April 16, 2005, compounded quarterly, from that date until the date of settlement of the contract."[602]

Kohlberg argues that Section 8.3(a) of the SPA forecloses prejudgment interest by providing that the Termination Fee

---

[599] *Id.*; *accord.* 3 Zachary Wolfe, *Farnsworth on Contracts* § 12.05, at 12-32 & n.17 (4th ed. 2019).

[600] *See, e.g., Osborn v. Kemp*, 2009 WL 2586783, at *12 (Del. Ch. Aug. 20, 2009) *aff'd* 991 A.2d 1153 (Del. 2010); *Tri State Mall Assocs. V. A.A.R. Realty Corp.*, 298 A.2d, 368, 371 (Del. Ch. 1972) ("[T]he Court in decreeing specific performance will adjust the equities of the parties in such a manner as to put them as nearly as possbiile in the same position as if the contract had been performed [a]ccording to its terms.").

[601] *Osborn*, 2009 WL 2586783, at *12.

[602] *Id.*; *see also IBP*, 789 A.2d at 83 n.203 (directing the parties to address "how any delay in payment of the Merger Consideration plays into an award of specific performance"); *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 3655257, at *17–18 (Del. Ch. Aug. 1, 2018) (awarding prejudgment interest after ordering specific performance of the sale of an LLC), *rev'd on other grounds*, 202 A.3d 482 (Del. 2019).

shall be the *sole and exclusive remedy* (whether at law, in equity, in contract, in tort or otherwise) . . . against Buyer . . . *for any and all losses*, costs, damages, claims, fines, penalties, expenses (including reasonable fees and expenses of outside attorneys), amounts paid in settlement, court costs, and other expenses of litigation suffered as a result of any breach of any covenant or agreement in this Agreement or the failure of the transactions contemplated hereby to be consummated.[603]

Section 8.3(a) further provides that "[u]nder no circumstances" will Plaintiffs "be entitled . . . to receive both a grant of specific performance and the . . . Termination Fee" or "to receive monetary damages other than the Termination Fee."[604]

The parties did not meaningfully brief this issue in post-trial briefing. Within five business days, the parties shall provide supplemental submissions as to Plaintiffs' entitlement to prejudgment interest.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiffs on their claim of specific performance of the SPA. In addition to the supplemental submissions requested by this decision, within five business days, the parties shall meet and confer to identify any other matters that the court needs to address to bring this action to a conclusion at the trial level. The parties shall identify those issues in a joint letter submitted to the court.

---

[603] SPA § 8.3(a) (emphasis added).

[604] *Id.*